T.C. Memo. 2012-110

UNITED STATES TAX COURT

SUPERIOR TRADING, LLC, JETSTREAM BUSINESS LIMITED,
TAX MATTERS PARTNER, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

---

[1]The following cases are consolidated herewith:  Nero Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20230-07; Pawn Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20232-07; Howa Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20243-07; Queen Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20337-07; Rook Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20338-07; Galba Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20652-07; Tiberius Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20653-07; Blue Ash Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20655-07; Lyons Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20867-07; Sterling Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20871-07; Good Karma Trading, LLC, Jetstream Business Limited, Tax Matters Partner, docket No. 20936-07; and Warwick Trading, LLC, Jetstream Business Limited, A Partner Other Than the Tax Matters Partner, docket No. 19543-08.

[*]This opinion supplements our prior Opinion, Superior Trading, LLC v. Commissioner, 137 T.C. 70 (2011), in all dockets consolidated therein except for Tiffany Trading, LLC, Walnut Fund, LLC, Tax Matters Partner, docket No.

(continued...)

Docket Nos.      20171-07, 20230-07,      Filed April 17, 2012.
20232-07, 20243-07,
20337-07, 20338-07,
20652-07, 20653-07,
20655-07, 20867-07,
20871-07, 20936-07,
19543-08.

John E. Rogers and Nicholas C. Mowbray, for petitioners.

Lawrence Charles Letkewicz and Laurie A. Nasky, for respondent.

SUPPLEMENTAL MEMORANDUM OPINION

WHERRY, Judge: Each of these consolidated cases constitutes a partnership-level proceeding under the unified audit and litigation provisions of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648, commonly referred to as TEFRA. Following a lengthy trial conducted the week of October 5, 2009, in Chicago, Illinois, we issued an Opinion

---

*(...continued)
20654-07, and Lonsway Trading, LLC, Bengley Fund, LLC, Tax Matters Partner, docket No. 20870-07. See also infra notes 3 and 6.

on September 1, 2011, <u>Superior Trading, LLC v. Commissioner</u>, 137 T.C. 70 (2011)

(<u>Superior Trading I</u>).[2]

Pursuant to the determinations set forth in <u>Superior Trading I</u>, we entered

decisions in all 15 of the previously consolidated cases on September 9, 2011.[3]

Each decision sustained respondent's adjustments to the partnership items of the

purported partnership at issue, and the applicability of penalties, as determined in

the underlying notice of final partnership administrative adjustment (FPAA) issued

pursuant to section 6223,[4] in the given case.

_____

[2]<u>Superior Trading I</u> covered 15 consolidated cases:  (1) all 13 cases that are the subject of this supplemental opinion and (2) Tiffany Trading, LLC, Walnut Fund, LLC, Tax Matters Partner, docket No. 20654-07, and Lonsway Trading, LLC, Bengley Fund, LLC, Tax Matters Partner, docket No. 20870-07.  We have since lost jurisdiction over the latter two cases.  <u>See</u> <u>infra</u> note 3.

[3]The 15 decisions included those entered in the cases of Tiffany Trading, LLC, Walnut Fund, LLC, Tax Matters Partner, docket No. 20654-07, and Lonsway Trading, LLC, Bengley Fund, LLC, Tax Matters Partner, docket No. 20870-07.  <u>See</u> <u>supra</u> notes 1 and 2.  Each of these two decisions is now "final" within the meaning of sec. 7481(a).  <u>See</u> <u>infra</u> note 6.  Consequently, the two cases are no longer subject to our jurisdiction.  "As a general rule, the Tax Court lacks jurisdiction to vacate a decision once it becomes final." <u>Abatti v. Commissioner</u>, 859 F.2d 115, 117 (9th Cir. 1988) (citing <u>Lasky v. Commissioner</u>, 235 F.2d 97, 98 (9th Cir. 1956), <u>aff'd</u>, 352 U.S. 1027 (1957)), <u>aff'g</u> 86 T.C. 1319 (1986); <u>cf.</u> <u>Stewart v. Commissioner</u>, 127 T.C. 109, 112 & n.3 (2006) (describing the "very limited exceptions" to this rule, none of which applies here).

[4]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax

(continued...)

On September 29, 2011, pursuant to Rule 161, petitioners in 13 of the
original 15 cases, which continue to remain consolidated here, timely filed a motion
for reconsideration of <u>Superior Trading I</u>.[5]  On October 6, 2011, these moving
petitioners filed a motion under Rule 162 to vacate the decisions in the respective
cases.[6]  The two motions contain substantially similar text.  Respondent filed

_____

[4](...continued)
Court Rules of Practice and Procedure.

[5]The motion for reconsideration was filed in all 15 cases previously
consolidated for trial and briefing, and covered by <u>Superior Trading I</u>, except for
Tiffany Trading, LLC, Walnut Fund, LLC, Tax Matters Partner, docket No.
20654-07, and Lonsway Trading, LLC, Bengley Fund, LLC, Tax Matters Partner,
docket No. 20870-07.

[6]Filing a motion to vacate terminates the running of time to file a notice of
appeal under sec. 7483.  This, in turn, prevents our decision from becoming final for
purposes of sec. 7481.  As a result, we retain jurisdiction over a case in which a
motion to vacate has been timely filed.  Rule 162 requires that "[a]ny motion to
vacate or revise a decision, with or without a new or further trial, * * * be filed
within 30 days after the decision has been entered, unless the Court * * * otherwise
permit[s]."  Fed. R. App. P. 13(a)(2) provides that "[i]f, under Tax Court rules, a
party makes a timely motion to vacate or revise the Tax Court's decision, the time
to file a notice of appeal runs from the entry of the order disposing of the motion or
from the entry of a new decision, whichever is later."
In the cases of Tiffany Trading, LLC, Walnut Fund, LLC, Tax Matters
Partner, docket No. 20654-07, and Lonsway Trading, LLC, Bengley Fund, LLC,
Tax Matters Partner, docket No. 20870-07, no motions were filed to reconsider
<u>Superior Trading I</u> or to vacate our respective decisions.  Further, in neither case
was "a notice of appeal [filed] with the clerk of the Tax Court within 90 days after
the decision of the Tax Court * * * [was] entered."  <u>See</u> sec. 7483.  Consequently,
in each of these two cases, "the decision of the Tax Court * * * [became] final
(continued...)

objections to both the motion to reconsider Superior Trading I and the motion to vacate the accompanying decisions.

Reconsideration pursuant to Rule 161 is intended to correct substantial errors of fact or law and allow the introduction of newly discovered evidence that the moving party could not have introduced, by the exercise of due diligence, in the prior proceeding. Estate of Quick v. Commissioner, 110 T.C. 440, 441 (1998). We have discretion to grant a motion for reconsideration but will not do so unless the moving party can point to unusual circumstances or substantial error. Id.; see also Vaughn v. Commissioner, 87 T.C. 164, 166-167 (1986). "Reconsideration is not the appropriate forum for rehashing previously rejected legal arguments or tendering new legal theories to reach the end result desired by the moving party." Estate of Quick v. Commissioner, 110 T.C. at 441-442; see also Estate of Turner v. Commissioner, 138 T.C. __, __ (slip op. at 3) (Mar. 29, 2012). For the reasons discussed below, we will deny both motions.

---

[6](...continued)
* * * [u]pon the expiration of the time allowed for filing a notice of appeal". See sec. 7481(a). As explained supra note 3, we lack jurisdiction over a case in which the decision is final.

## Background

We adopt the findings of fact we made in Superior Trading I.[7]  For convenience and clarity, we repeat some of these findings as necessary for the disposition of the two motions.

## Discussion

I.    Instant Replay

A.    A Swing and Four Misses

John Rogers is a tax lawyer who devised and marketed the "paternalistically" called DAD (an acronym for distressed asset/debt) shelter at issue in the consolidated cases.  See generally Superior Trading I, 137 T.C. at 73-78.  To effectuate the DAD shelter in these cases, Rogers set up an elaborate Rube Goldberg machine consisting of:  a purported partnership between Arapua, a Brazilian retailer and Jetstream, a British Virgin Islands company, ostensibly for servicing and collecting distressed consumer receivables owed to the retailer; trading companies, which came to hold Arapua's consumer receivables; and holding companies in which individual U.S. investors invested.

---

[7]Unless otherwise indicated, defined terms continue to have the meaning ascribed to them in Superior Trading I.

In Superior Trading I, we held that: (1) a bona fide partnership was never formed for Federal tax purposes between Arapua and Jetstream; (2) Arapua never made a valid contribution of the consumer receivables to the purported partnership under section 721; (3) these receivables should not receive carryover basis treatment under section 723; and (4) Arapua's claimed contribution and subsequent redemption from the purported partnership should be collapsed into a single transaction and recharacterized as a simple sale of the receivables. These are all alternative holdings, each by itself sufficient to sustain respondent's adjustments to the partnership items of the respective purported partnerships.

As we explained in Superior Trading I, under any one of these holdings, the basis of Arapua's receivables in the hands of the various purported partnerships that came to acquire ownership interests in them is zero. Consequently, each of our alternative holdings results in a gross valuation misstatement within the meaning of section 6662(h)(2)(A)(i). Therefore, in Superior Trading I, we sustained respondent's determination of a 40% accuracy-related penalty for all consolidated cases.

B.     View From the Bleachers

Granting motions to reconsider and vacate lies within our discretion. See generally Intermountain Ins. Serv. of Vail, Ltd. Liab. Co. v. Commissioner, 134

T.C. 211, 215 (2010) (citing Estate of Quick v. Commissioner, 110 T.C. 440, 441 (1998), and Kun v. Commissioner, T.C. Memo. 2004-273), rev'd on other grounds, 650 F.3d 691 (D.C. Cir. 2011).

The motions before us to reconsider and vacate are a curious admixture of a regurgitation of unfounded assertions and half-baked theories soundly rejected in Superior Trading I, a disingenuous criticism of our holdings in that Opinion, and fanciful claims of newly discovered evidence that allegedly undermines our findings of fact supporting those holdings. Consequently, these motions merit no more than a summary denial.

Yet we recognize that the dispute at the center of the consolidated cases could morph and present itself in other manifestations. Therefore, to provide additional guidance on our interpretation of the applicable law, we have set forth in some detail our reasons for denying the motions. In so doing, we have no illusions of persuading all moving petitioners. Instead, we write now for the benefit of the "silent waters that run deep"--the dozens of deep-pocketed investors who acquired ownership interests in the various holding companies, which in turn sought to exploit the inflated basis of the Arapua receivables. After all the linen is washed, these investors constitute the fonts whither the promised tax savings from chimeral

losses would have drained and whence the required tax payments for determined deficiencies and accuracy-related penalties will flow.

Under section 6231(a)(2)(B), "The term 'partner' means * * * any * * * person whose income tax liability under subtitle A is determined in whole or in part by taking into account directly or indirectly partnership items of the partnership." As we described in Superior Trading I, the investors in the holding companies were never members in the same limited liability company as Arapua. Regardless, to the extent their income tax liability is affected by the basis of the Arapua receivables, a partnership item in these partnership-level proceedings, these investors are partners for purposes of these proceedings.

Consequently, pursuant to section 6226(c)(1), each such investor "shall be treated as a party to such action". And though it is already too late for these deemed parties to participate in these proceedings, it might not be too early for them to begin preparing for what is surely coming down the pike--computational adjustments by means of either direct assessment or partner-level deficiency proceedings. See generally Thompson v. Commissioner, 137 T.C. 220 (2011).

II.     Burnishing Fool's Gold

The twin motions, to reconsider and to vacate, resurrect in the garb of new arguments and novel approaches petitioners' failed claims from Superior Trading I, either advanced at trial or developed in posttrial briefs, that a bona fide partnership was formed between Arapua and Jetstream for servicing Arapua's distressed receivables.

The motions fault Superior Trading I for denying that "Arapua and Jetstream * * * had a common intention to collectively pursue a joint economic outcome * * * [and] that Arapua and Jetstream ever came together to constitute an 'entity' for this purpose." Superior Trading I, 137 T.C. at 81. The motions adduce three grounds for reversing these conclusions: (1) Commissioner v. Culbertson, 337 U.S. 733 (1949), no longer governs whether a partnership exists for Federal income tax purposes; (2) section 704(e)(1) obviates an inquiry into the parties' subjective intent to form a partnership; and (3) Moline Props., Inc. v. Commissioner, 319 U.S. 436 (1943), compels us to find a valid partnership here. All of these arguments repudiate petitioners' own reasoning expounded before, at and after trial, while contorting both statutory law and caselaw.

A.     Culberston Is Dead; Long Live Culbertson

Citing Pflugradt v. United States, 310 F.2d 412, 415 (7th Cir. 1962), the

motion to reconsider alleges that

> the Court erred by relying on the decisions set forth in Commissioner v.
> Culbertson, 337 U.S. 733 (1949), Commissioner v. Tower, 327 U.S.
> 280 (1946), and Frazell v. Commissioner, 88 T.C. 1405, 1412 (1987).
> * * * These cases were decided well before the passage of the
> check-the-box rules and prior to the passage of Section 704(e) of the
> Code.  As such, they are no longer determinative of what should be
> considered a partnership.  Instead, the proper test for determining
> whether an entity is a valid partnership is instead [sic] found either
> under Moline Properties v. Commissioner, 319 U.S. 436 (1943) or
> I.R.C. § 704 (e).

This allegation is hypocrisy cloaked in hyperbole.  Petitioners had espoused

fealty to Culbertson well before these proceedings got underway and continued to

swear allegiance to it up until the motion for reconsideration.  As respondent points

out in his objection to this motion:

> petitioners discuss Culbertson with approval in their Post-Trial Brief:
> "[a]s a landmark case, Culbertson and its progeny look to the facts and
> circumstances surrounding the partnerships."  Then, petitioners provide
> an eight-line block quote from Culbertson which ends with the words
> "the parties in good faith and acting with a business purpose intended
> to join together in the present conduct of the enterprise."  In the
> materials Rogers used to sell the DAD shelters, Rogers described
> Culbertson and Commissioner v. Tower, 327 U.S. 280 (1946), as the
> legal standard for determining whether a partnership existed.
> [Citations omitted.]

Moreover, in <u>Superior Trading I</u>, 137 T.C. at 81, in the paragraph immediately following citations of "<u>Commissioner v. Culbertson</u>, 337 U.S. 733, 737 (1949); <u>Commissioner v. Tower</u>, 327 U.S. 280, 287-288 (1946); <u>Frazell v. Commissioner</u>, 88 T.C. 1405, 1412 (1987)", we had acknowledged that "The so-called check-the-box regulation, section 301.7701-3(a), Proced. & Admin. Regs., certainly allows 'An eligible <u>entity</u> with at least two members * * * [to] elect to be classified as * * * a partnership'". (Emphasis supplied.) We concluded, "[h]owever, [that] we remain far from persuaded that Arapua and Jetstream ever came together to constitute an '<u>entity</u>' for this purpose." <u>Id.</u> (emphasis supplied). Yet the motion to reconsider alleges that our citation of <u>Culbertson</u> in <u>Superior Trading I</u> reveals a disregard of the impact of the check-the-box regulation. The motion to reconsider seems to have gone beyond the pale of zealous advocacy and hovers perilously close to insincerity.

Moving petitioners claim, in a footnote, that

[t]he Court additionally misapplies the check-the-box regulations by stating "[a]n eligible entity with at least two members...[to] elect to be classified...as a partnership." Under the check-the-box regulations, entities with two members that are not per-se corporations as defined under Treasury Regulation 301.7701-2(b) are by default partnerships. Treas. Reg. §301.7701-2(c) (1). No election is required. [Omissions, insertions, and awkward grammar in original.]

Moving petitioners' argument would be amusing if it were not so costly in terms of the total tax dollars at stake. We had cited the check-the-box regulation, section 301.7701-3(a), Proced. & Admin. Regs., for the proposition that an elective classification as a partnership was available to Arapua and Jetstream, but only if the two together would otherwise be recognized as an entity for this purpose.[8] Section 301.7701-2(a), Proced. & Admin. Regs., is explicit that "For purposes of * * * § 301.7701-3, a business entity is any entity recognized for federal tax purposes". (Emphasis supplied.) Whether the classification as a partnership is effected by affirmative election or by electing not to disturb the default classification was beside the point that we were making.[9]

---

[8]Sec. 301.7701-3(a), Proced. & Admin. Regs., provides that

An eligible entity with at least two members can elect to be classified as either an association (and thus a corporation under § 301.7701-2(b)(2)) or a partnership, and an eligible entity with a single owner can elect to be classified as an association or to be disregarded as an entity separate from its owner.

Paragraph (b) of this section provides a default classification for an eligible entity that does not make an election. Thus, elections are necessary only when an eligible entity chooses to be classified initially as other than the default classification or when an eligible entity chooses to change its classification. * * * [Emphasis supplied.]

[9]In Luna v. Commissioner, 42 T.C. 1067, 1077-1078 (1964), the Court listed

(continued...)

⁹(...continued)
the following factors, none of which alone is dispositive, as relevant for concluding whether, as a factual matter, a partnership was formed:

> [1] The agreement of the parties and their conduct in executing its terms; [2] the contributions, if any, which each party has made to the venture; [3] the parties' control over income and capital and the right of each to make withdrawals; [4] whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; [5] whether business was conducted in the joint names of the parties; [6] whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; [7] whether separate books of account were maintained for the venture; and [8] whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise.

The import of these so-called Luna factors has not dissipated any after the promulgation of sec. 301.7701-3(a), Proced. & Admin. Regs. See generally WB Acquisition, Inc. v. Commissioner, T.C. Memo. 2011-36 (stating that in "Luna v. Commissioner, * * * this Court distilled the principles mentioned in Commissioner v. Tower * * * and Commissioner v. Culbertson * * * to set forth the * * * [Luna] factors as relevant in evaluating whether parties intend to create a partnership for Federal income tax purposes", and applying the Luna factors to determine whether a joint venture existed for the years at issue).

It may be argued that the May 7, 2003, Contribution Agreement, pursuant to which Arapua transferred its receivables, favorably disposes the first two Luna factors towards a finding of a valid partnership. The tax accounting prepared for the nominal partnership between Arapua and Jetstream arguably does the same with respect to the seventh Luna factor. Other than these possible tenuous contentions, however, no evidence has been introduced that would support a valid partnership under the remaining five Luna factors.

(continued...)

[9](...continued)

Initially, there was no showing that Arapua had any actual say in how the receivables were to be serviced or otherwise managed. To the contrary, as indicated infra text between notes 11 and 12, Rogers apparently acted unilaterally in engaging Multicred as the loan servicer. This weighs against a valid partnership under both the third Luna factor addressing "the parties' control over income and capital", and the eighth Luna factor requiring "mutual control over and * * * mutual responsibilities for the enterprise."

Moreover, it is extremely doubtful that Arapua "shar[ed] a mutual proprietary interest in the net profits and ha[d] an obligation to share losses", as set forth in the fourth Luna factor. At trial respondent introduced credible evidence that the Arapua receivables, which petitioners there claimed constituted Arapua's contribution, were the same that Arapua had previously transferred to another servicer. Respondent persuasively demonstrated that this servicer had subsequently returned these receivables back to Arapua as essentially uncollectible. See Superior Trading I, 137 T.C. at 85-86 & n.15. If this was indeed what had transpired, then there was little, if any, potential for generating profits from servicing the Arapua receivables.

Any liability on the part of Arapua for "contributing" uncollectible receivables was nullified by a limitation of liability clause in the May 7, 2003, Contribution Agreement. Pursuant to this clause, the nominal partnership's " maximum aggregate liability * * * in respect of all * * * Damages shall not exceed US $99,000". Conversely, "the maximum aggregate liability of * * * [the nominal partnership] in respect of all * * * Damages relating in any way to any Receivables shall not exceed the current fair market value of such Receivable at the time such * * * Damages are asserted." The consequence of this limitation of liability clause, as respondent asserts, is that, as to misrepresentations made in the May 7, 2003, Contribution Agreement, "$99,000 was the maximum liability * * * [that the nominal partnership could owe to Arapua] for any damages of Arapua. Arapua's liability [in turn] was limited to the fair market value of the receivables at the time * * * [the nominal partnership] asserted a claim for damages."

As a result, Arapua's representations and warranties in the May 7, 2003, Contribution Agreement regarding the quality of the transferred receivables were completely "toothless". If, in contradiction to Arapua's representations and

(continued...)

B.     <u>All In the Family</u>

The motion to reconsider argues that it is section 704(e)(1), and not

<u>Culbertson</u>, that supplies the definitive test to be applied here for "determining a

---

[9](...continued)
warranties, and as alleged by respondent, the transferred receivables turned out to have been those previously serviced by another entity, and deemed uncollectible and returned to Arapua, or had already been written off for Brazilian regulatory purposes, Arapua would be liable only to the extent of those receivables' prevailing fair market value. The latter, in turn, would assuredly have declined to reflect Arapua's own violation of its representations and warranties. Thus, Arapua bore no real liability for breaching any of its representations and warranties. Conversely, Arapua's remedy for any violations of the representations and warranties furnished by the nominal partnership regarding Arapua's rights and privileges was limited to $99,000. In sum, the history of the receivables, along with the limitation of liability clause in the May 7, 2003, Contribution Agreement, appear to have reduced Arapua's role in the venture to that "of the agent or employee", a fatal flaw for a favorable finding under the fourth <u>Luna</u> factor.

Further, there was no sign of any representations made to participants in the market for servicing and collecting distressed receivables, in Brazil or the United States, that Arapua and Jetstream were joining forces as partners. This weighs against finding a valid partnership under the fifth <u>Luna</u> factor. Federal income tax returns, Forms 1065, U.S. Return of Partnership Income, were filed for the nominal partnership in which Arapua was allegedly a partner for the tax years 2003 and 2004. However, there was no suggestion that Arapua itself represented or revealed to Brazilian tax or financial reporting authorities that it had entered into a partnering arrangement or otherwise acquired a membership interest in an entity taxed as a U.S. partnership. Thus, the sixth <u>Luna</u> factor weighs against a valid partnership.

No more than three of the <u>Luna</u> factors can be deemed to support a valid partnership, even at a superficial level. The remaining five <u>Luna</u> factors either were not adequately proved or clearly repudiate a valid partnership. Thus, a full-blown application of the eight-factor <u>Luna</u> inquiry gives us no reason to reconsider or revise in the slightest our previous conclusion in <u>Superior Trading I</u> that no valid partnership was formed between Arapua and Jetstream.

putative partner's status".  Section 704(e)(1) provides that "A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which <u>capital is a material income-producing factor</u>".  (Emphasis supplied.)  Section 704(e), which is titled "Family partnerships", was enacted in 1951 "to harmonize the rules governing interests in the so-called family partnership with those generally applicable to other forms of property or business."  S. Rept. No. 82-781 (1951), 1951-2 C.B. 458, 485.

Despite its title and the congressional motivation in enacting section 704(e), the provisions of section 704(e)(1) have been held to apply broadly to all partnerships in which capital is a material income-producing factor by the Court of Appeals for the Seventh Circuit, where an appeal of the consolidated cases, absent stipulation to the contrary, lies.  See <u>Evans v. Commissioner</u>, 447 F.2d 547, 550 (7th Cir. 1971) ("We cannot agree that * * * Congress intended to limit § 704(e)(1) to family partnerships"), <u>aff'g</u> 54 T.C. 40, 51 (1970) (section 704(e) "is broad in its scope and covers a situation such as the instant case which does not involve a 'family partnership'"); <u>see also</u> <u>Carriage Square, Inc. v. Commissioner</u>, 69 T.C. 119, 126 n.4 (1977) (citing <u>Evans</u> for the proposition that "[a]lthough such section is primarily directed toward 'family partnership,' its language is sufficiently broad to

cover the instant case which does not involve a 'family partnership' as defined in sec. 704(e)(3)").

The motion to reconsider dutifully notes that Evans supports the assertion that "Section 704(e) applies to all partnerships in which capital is a material income-producing factor." However, neither this assertion, nor Evans by itself, admits the conclusion that Culbertson no longer applies to nonfamily partnerships in which capital is a material income-producing factor. Seeking to persuade us that Culbertson is inapplicable here, the motion to reconsider twice cites Pflugradt v. United States, 310 F.2d at 415, in each instance accompanied by the following identical parenthetical quotation from it: "The test is no longer whether the parties acted in good faith with a business purpose in joining together to conduct the partnership business. This was the test set forth in Culbertson * * * before present § 704(e)(1) was part of the Code." (Omissions and emphasis in original.) Since Pflugradt was a family partnership case, this replicated citation and parenthetical quote hardly advances the moving petitioners' cause that Culbertson is no longer good law for partnerships other than family partnerships.

Respondent, for his part, in objecting to the motion to reconsider concedes that "Courts, including the Seventh Circuit, have applied section 704(e)(1) in family partnership cases; however, in cases not involving family partnerships, they have

continued to apply the intent-based <u>Culbertson</u> test." As support, respondent cites

<u>Kanter v. Commissioner</u>, 590 F.3d 410, 424-425 (7th Cir. 2009) (citing

<u>Commissioner v. Culbertson</u>, 337 U.S. at 742), <u>rev'g in part, vacating in part</u> T.C.

Memo. 2007-21, where the Court of Appeals for the Seventh Circuit applied the

<u>Culbertson</u> totality-of-circumstances test to determine "whether, considering all the

facts[,] * * * the parties in good faith and acting with a business purpose intended to

join together in the present conduct of the enterprise." Respondent contends that

because "<u>Kanter</u> did not involve a family partnership[,] * * * the Seventh Circuit

appropriately applied <u>Culbertson</u>'s intent-based test."

Respondent's heroics notwithstanding, we do not read <u>Kanter</u> as reversing the

Court of Appeals for the Seventh Circuit's own holding in <u>Evans</u> that section

704(e)(1) applies to all partnerships, and not just family partnerships, in which

capital is a material income-producing factor. We believe that the court, in <u>Kanter,</u>

applied the <u>Culbertson</u> totality-of-circumstances test because the trial judge "did not

base his ruling on the fact that capital from the other partners was a material income

producing factor (a test derived from Internal Revenue Code § 704(e)); instead, he

found that the partners had a good-faith intent to conduct a business enterprise."

<u>Kanter v. Commissioner</u>, 590 F.3d at 425. The Court of Appeals found, after

"applying the test outlined in <u>Culbertson</u>, that the record adequately supports the

* * * [trial judge's] finding that all of the claimed partners * * * were the actual partners." Id.  In other words, in the absence of an evidentiary record establishing that capital was a material income-producing factor of the partnership at issue, Culbertson supplied the applicable test.

This formulation by the Court of Appeals for the Seventh Circuit of the Culbertson test as the alternative to be invoked when the predicate for section 704(e)(1) is not satisfied is entirely consistent with other opinions from courts in that and other circuits.  See, e.g., TIFD III-E, Inc. v. United States, 459 F.3d 220, 231, 241 n.19 (2d Cir. 2006) (faulting the trial court for finding a valid partnership "without examining the question under the all-facts-and-circumstances test of Culbertson", and remanding "for consideration in the first instance" the taxpayer's argument that, regardless of the outcome of the Culbertson inquiry, a valid partnership existed under section 704(e)(1)); Atlas v. United States, 555 F. Supp. 110, 114 (N.D. Ill. 1982) ("Culbertson is still good law. * * *  This is so although the Code's present section 704(e)(1) replaced the 'good-faith/business purpose' test in force in 1949 with the 'ownership of a capital interest' test."); cf. TIFD III-E, Inc. v. United States, 666 F.3d 836, 847 (2d Cir. 2012) ("assuming [but not conceding] * * * that there may be circumstances in which the application of Culbertson and §704(e)(1) yields different results as to whether the purported holder of a

partnership interest qualifies as a partner", the court held that in "[a]pplying Culbertson, we * * * found that the taxpayer's claimed subjective intent was insufficient to defeat the plain objective facts. And we rely on largely the same objective factors in concluding * * * [the absence of] a 'capital interest' for the purpose of §704(e)(1)." (Emphasis supplied.)).

None of the petitioners in the consolidated cases, before, at trial, or in their posttrial briefs, argued that section 704(e)(1) applied to the purported partnership between Arapua and Jetstream because capital was a material income-producing factor. There is not a single citation of section 704(e)(1) in either the opening or reply brief for any petitioner. Indeed, as discussed above, petitioners had cited Culbertson, at length and with approval, in their opening brief. Further, no evidence was introduced at trial to establish the materiality of capital as an income-producing factor of the alleged business enterprise established by Arapua and Jetstream.

Pursuant to Rule 142(a), the burden of proving the existence of a valid partnership between Arapua and Jetstream lies on petitioners. See Republic Plaza Props. P'ship v. Commissioner, 107 T.C. 94, 104 (1996) ("Petitioner bears the burden of proving that respondent's determinations in the FPAA are erroneous."). Petitioners failed to raise the applicability of section 704(e)(1) in their petitions

when assigning errors to respondent's FPAAs. Under Rule 241(b) and (d)(1)(C), which governs the content of "petitions in partnership actions", "[a]ny issues not raised in the assignments of error * * * shall be deemed to be conceded." Moreover, the record in the cases is devoid of any evidence of the materiality of capital as an income-producing factor of the claimed partnership.

The motion to reconsider contends that "Arapuã's contribution of the receivables was <u>clearly</u> a capital contribution." (Emphasis supplied.) The motion doubles down on this attempt at "proof by intimidation" and declares that "Arapuã's interest is the <u>very definition</u> contemplated by the regulations promulgated under Section 704(e) and acknowledged by the Seventh Circuit." (Emphasis supplied.) Dispensing with the niceties of referring to previously admitted evidence, the motion proclaims in conclusory fashion that the purported venture between Arapua and Jetstream "was a capital intensive partnership because it required money and other financial resources to produce income and acquire new portfolios of debt to collect upon."

Under Rule 143(c), "statements in briefs, and unadmitted allegations in pleadings do not constitute evidence." The motion does not ask us to reopen the record to introduce new evidence regarding the materiality, for purposes of section 704(e)(1), of capital as an income-producing factor for the purported partnership

between Arapua and Jetstream. Even if it did, we would deny such a request for the reasons set forth below in Part III. In the absence of an evidentiary record establishing that capital was a material income-producing factor in the purported partnership at issue, Kanter is clear that Culbertson's intent-based test controls the resolution of whether a partnership was formed. Superior Trading I properly applied this test to conclude the absence of a valid partnership between Arapua and Jetstream.[10]

---

[10]Searching the record on our own, we are at a loss to see how moving petitioners' invocation of "the regulations promulgated under Section 704(e)" advances their cause any. "In general, capital is not a material income-producing factor where the income of the business consists principally of fees, commissions, or other compensation for personal services performed by members or employees of the partnership." Sec. 1.704-1(e)(1)(iv), Income Tax Regs.

Petitioners' own posttrial brief underlined the limited availability and use of capital and the labor-intensive nature of the business venture that Rogers was purportedly pursuing. Highlighting the "shoestring" quality of the venture's operations, the brief proudly proclaims that "Rogers and Multicred risked the funds they had invested to start the venture. * * * There were no other coffers or deep pockets engaged in the venture from which to draw. Rogers did not enjoy substantial income or capital from other sources to cushion an economic loss at the time and scarce funds were devoted to planning, due diligence and implementation of the business plan." Nothing we say could be more damning to moving petitioners' sec. 704(e)(1) argument than the assertion in petitioners' posttrial brief that the claimed partnership between Arapua and Jetstream "was capitalized with a thousand U.S. dollars, not hundreds of thousands."

Moreover, moving petitioners' claims of Arapua's contribution, which they insist "was clearly a capital contribution", arguably substantiated, could not increase capital by more than $200,000. See infra note 12 and accompanying text (discussing the aggregate payments made to Arapua). Even assuming that none of
(continued...)

-24-

[10](...continued)

the payments to Arapua represented compensation for the favorable tax attributes of the receivables, i.e., the built-in losses, Arapua's capital contribution was no more than $200,000. Employing that contribution, and arguably "a thousand U.S. dollars", which petitioners' posttrial brief quantifies as the cash capital at the venture's disposal, the claimed partnership between Arapua and Jetstream was able to generate revenues that petitioners acknowledge aggregated at least $4.38 million during 2003 and 2004. Pointing to such revenues, petitioners' posttrial brief boasts that "there are over 4.38 million reasons Respondent's position on economic substance is errant."

Clearly, the magnitude of capital that the venture allegedly deployed pales in comparison to the amount of income that it admittedly earned. Capital seems to be even more insignificant to the venture's scale and scope when one considers the face amount of so-called assets asserted to have been controlled. Rogers testified at trial, and petitioners' posttrial brief reiterates, that "[o]n May 7, 2003 Arapuã contributed approximately [Brazilian] R$103,000,000 worth of receivables to" the claimed partnership with Jetstream. At the then-prevailing exchange rate, these receivables constituted approximately $36.78 million in face value. That figure represents a multiple exceeding 180 times the total amount of capital of no more than $201,000 that moving petitioners allege was made available to the venture. Petitioners' posttrial brief contends that "[t]he record in this case confirms that the partnership held substantial assets, namely the contributed receivables." (Emphasis supplied.) What was left unsaid, but what follows inevitably from moving petitioners' claims, is that such "substantial assets" were obtained and supported by a relatively small sum of quantifiable capital.

As sketched out by petitioners at trial and in their posttrial brief, the supposed business plan underlying the activities and operations that respondent has challenged envisaged extracting value from receivables with a meager measure of objectively verifiable worth. Petitioners' posttrial brief states that "Arapuã and Jetstream shared the same goal and motivation: unlock value from previously non-performing, dusty assets in order to turn a profit." However, "capital is ordinarily a material income-producing factor if the operation of the business requires substantial inventories or a substantial investment in plant, machinery, or other equipment." Sec. 1.704-1(e)(1)(iv), Income Tax Regs. Petitioners' avowed business plan belies

(continued...)

[10](...continued)
the conclusion that capital was a material income-producing factor of their venture under the very regulations they would have us apply.

Finally, we consider an argument that moving petitioners have not quite enunciated but that we can isolate as the only one possibly supporting a finding that capital was a material income-income producing factor of the venture between Arapua and Jetstream. This argument would discard petitioners' earlier submissions that the business plan for the venture between Arapua and Jetstream consisted of "unlock[ing] value from previously non-performing, dusty assets in order to turn a profit", clearly a labor-intensive enterprise. Instead, the argument would posit Jetstream partnering with Arapua to realize economic gains latent in the receivables, arguably an operation in which capital is material to the production of income. Under this theory, the relatively small amount of Arapua's redemption payments could conceivably be explained away as a bargaining triumph on the part of Jetstream.

But once we acknowledge that the venture consisted of seeking to reap economic gains inherent, albeit not fully exposed, in the Arapua receivables, then claims for nonrecognition treatment under sec. 721 become untenable. Specifically, the professed venture is then transparently rendered an "arrangement by which the fruits are attributed to a different tree from that on which they grew." Lucas v. Earl, 281 U.S. 111, 114-115 (1930). The case stands for the general proposition that income is taxed to the one who earns it. Conversely, tax deductions are allowed to the one who suffers the corresponding economic loss. This anticipatory-assignment-of-income doctrine should preclude nonrecognition under sec. 721 for Arapua's transfer of receivables and render the transaction a sale for tax purposes. To show this, we digress a little and delve into the legislative history of amendments made in 1984 to a related Code section, sec. 704(c).

Sec. 704(c), which generally reserves precontribution gain or loss on contributed property for allocation to the contributing partner, was amended in 1984 and made mandatory for all income items relating to the contributed property. Before the 1984 amendments to sec. 704(c), courts routinely applied the assignment-of-income doctrine articulated in Lucas v. Earl, 281 U.S. at 114-115, to prevent contributing partners from assigning income to other partners. See, e.g., Villere v. Commissioner, 133 F.2d 905 (5th Cir. 1943); Mayes v. Commissioner,

(continued...)

21 T.C. 286 (1953); Mayes v. United States, 106 F. Supp. 961 (E.D. Okla. 1952), aff'd, 207 F.2d 326 (10th Cir. 1953).

In 1984 Congress amended sec. 704(c) to cover not just "depreciation, depletion, or gain or loss" relating to contributed property, but also all allocations of "income, gain, loss, and deduction" arising from such property. Congress was especially concerned about shutting down the abusive transfer to a partnership of accounts receivable by a cash method partner, a transfer that effectively assigned to the other partners income that had been earned by the contributing partner. See H.R. Conf. Rept. No. 98-861 at 856 (1984), 1984-3 C.B. (Vol. 2), 1, 110. Congress expected that as a consequence of extending sec. 704(c) to income items, the nonrecognition rule of sec. 721 would generally govern contributions of ongoing businesses and works-in-progress to a partnership. See id.; see also Rev. Rul. 84-115, 1984-2 C.B. 118.

However, Congress made it clear that the assignment-of-income doctrine continues to remain applicable in the partnership context. In particular, the conference committee report is explicit that the 1984 amendments to sec. 704(c) are not "intended to override the anticipatory assignment of income doctrine in those situations in which such doctrine would apply to a cash method partner's contribution of accrued but unpaid items to a partnership." H.R. Conf. Rept. No. 98-861 at 856.

As we explained in Superior Trading I, 137 T.C. at 78-80, the transactions at issue here sought to exploit a perceived loophole in sec. 704(c), as in effect before October 22, 2004. Based on the legislative history of the 1984 amendments to sec. 704(c), discussed above, there is a compelling, almost irresistible, case for filling any gap, real or imagined, in the allocation regime of sec. 704(c) by invoking the assignment-of-income doctrine, where applicable. And, as also shown above, arguing that Jetstream and Arapua were partners in a business for realizing latent economic gains in consumer receivables justifies, virtually mandates, applying the assignment-of-income doctrine. Consequently, Arapua's transfer of receivables should not receive nonrecognition treatment, but instead be considered a taxable sale or exchange. All built-in tax losses in the receivables would then be considered realized at the time of transfer and be allocable to Arapua.

Thus, it seems to us that moving petitioners' sec. 704(e)(1) victory,

(continued...)

C.    <u>Life Is Life and Fun Is Fun, but It's All So Quiet When the Goldfish Die</u>.

In an attempt to salvage the claimed partnership between Arapua and Jetstream, the motion to reconsider makes one final argument that we can only, and charitably, label a non sequitur.  The motion contends that our candid observation in <u>Superior Trading I</u>, 137 T.C. at 80, that "servicing of distressed Brazilian consumer receivables was attracting the interest and investment dollars of legitimate and sophisticated U.S. investors during 2003 and 2004" is "<u>alone</u> determinative of a valid partnership" between Arapua and Jetstream.  (Emphasis supplied.)

As support for this leap of (il)logic from our neutral comments on market conditions to petitioners' favored tax outcome, the motion cites <u>Moline Props., Inc. v. Commissioner</u>, 319 U.S. 436 and <u>Bertoli v. Commissioner</u>, 103 T.C. 501 (1994).  Respondent points out in his objection to the motion to reconsider that "Under <u>Moline Properties</u>, a corporation is to be respected for federal tax purposes if its

---

[10](...continued)
howsoever remote its likelihood, could only be Pyrrhic.  Prevailing in the battle to invoke sec. 704(e)(1) (to establish a valid partnership) would extract the ultimate cost of losing the war over nonrecognition treatment under sec. 721 (to retain the receivables' built-in tax losses).

purpose at the time of formation is to conduct a business or if it carries on a business."

This Court had applied this disjunctive two-pronged test of <u>Moline Props.</u> in <u>Bertoli</u> to a nominal partnership between family members that a State court had previously found "was a 'sham' created for the purpose of defrauding creditors". <u>Bertoli v. Commissioner,</u> 103 T.C. at 502. Because "[t]he labels applied to a transaction for purposes of State law are not binding for Federal tax purposes", the Court looked to "the principles announced in <u>Moline Properties</u> * * * to [determine] whether a partnership will be recognized for Federal tax purposes." <u>Id.</u> at 511. Thus, the Court required that "the <u>entity</u> (1) must be created for a business purpose, or (2) must carry on a business activity." <u>Id.</u> at 512 (emphasis supplied).

What we said in <u>Superior Trading I</u> regarding the market for servicing Brazilian consumer receivables does not satisfy either of these prongs of the <u>Moline Props.</u> disjunctive test with respect to the purported partnership between Arapua and Jetstream. Moving petitioners defy both grammar and grace to arrogate and impute to their own actions our general observation about "legitimate and sophisticated U.S. investors" investing in this market. Concluding from our statement that the particular entity allegedly formed by Arapua and Jetstream

furthered a nontax legitimate (or sophisticated) business purpose, or conducted legitimate (or sophisticated) business activities is unwarranted and untenable.

To the contrary, we had explicitly found in Superior Trading I, 137 T.C. at 82, that "Arapua's sole motivation appeared to be to derive cash for its receivables in order to avert or delay a forced liquidation." We had underlined "the stark divergence in the respective interests of Arapua and Jetstream with respect to the transfer of the receivables". Id. We went on to find that "Arapua was not seeking to partner with Jetstream in servicing and extracting value from the receivables. Instead, it was looking for ready cash." Id.

Ignoring these findings of fact, moving petitioners instead torture our commentary to extract an imagined confession. As literary devices, non sequiturs may provide comedic relief. But as logical constructs, they are irksome, and in resolving tax disputes, misleading.

III.    The Dog That Did Not Bark

In Superior Trading I, 137 T.C. at 82, we concluded that the marked contrast in the motivations of Arapua and Jetstream militated against finding either that a valid partnership existed between the two or, assuming arguendo, such a partnership, that a "bona fide contribution of the receivables" was made by Arapua. We stated that though

> [t]he objective evidence regarding the stark divergence in the
> respective interests of Arapua and Jetstream with respect to the transfer
> of the receivables undermines petitioners' cause * * * [,] [e]ven more
> troubling is petitioners' failure to definitively account for Arapua's
> so-called redemption from the purported partnership. Petitioners failed
> to establish exactly when and how Arapua was paid to give up its
> claimed partnership interest. * * *

Id. To us, this failure was analogous to " the curious incident of the dog in the night-time * * * [that] did nothing".[11] In response, moving petitioners now insist on going back in time and adding sound to a hitherto deafeningly silent vignette. They claim, as it were, that far from doing nothing the dog was actually barking its head off all night.

The motion to vacate claims that "[s]ubsequent to trial petitioners obtained copies of checks issued by a third party to Arapuã in 2003 and 2004 of which Petitioners did not have possession at trial[,]* * * [which] checks show that Arapuã was * * * redeemed out by * * * [this] third party." This Vivaldi-like orchestration of a barking dog is too contrived and arrives too late in the season to "spring" to petitioners' aid.

We ignore, for now, questions of admissibility of the "newly discovered evidence" and consider the offered evidence at face value. Copies of the two self-

---

[11]Arthur C. Doyle, Silver Blaze (1890), reprinted in William S. Baring-Gould, The Annotated Sherlock Holmes 261, 277 (1967).

styled checks were attached as Exhibit A to the motion to vacate. A cursory examination confirms respondent's statement that these "checks" are, in fact, "untranslated documents purportedly showing wire transfers * * * to Arapua". We agree with respondent that evidence of these wire transfers does "not support petitioners' cases and, therefore, would not change the outcome." Both wire transfers originated in 2003, on November 24, and December 2, respectively.

The originator of both wire transfers was Multicred, a collection agency engaged by Rogers, on behalf of Jetstream, to service the Arapua receivables. The motion to vacate implies that Multicred was the third party that had redeemed Arapua from its purported partnership with Jetstream. However, at trial Rogers had testified on cross-examination that "[w]ith Multicred[,] I had an understanding that for 2003 that half of the 6 percent investment would come to Brazil and that out of that they would pay their expenses and they would redeem out Arapua". (Emphasis supplied.)

The motion to vacate's claim of Arapua's being redeemed by a third party subverts substance in favor of form. Moreover, the claim is contradicted by Roger's own trial testimony. The wire transfers merely serve to corroborate Rogers' trial testimony that Multicred was acting as Jetstream's de facto agent in making redemption payments to Arapua. Further, evidence of some of the payments made

to Arapua, whether on behalf of Jetstream or by a third party, in no way undermines our finding, in Superior Trading I, 137 T.C. at 82, that "[p]etitioners failed to establish exactly when and how Arapua was paid to give up its claimed partnership interest". That moving petitioners have finally been able to account for a portion, or perhaps even all, of the cash eventually transferred to Arapua does not, by itself, definitively resolve the uncertainty surrounding the consideration promised, and paid, to Arapua for relinquishing the entirety of its purported partnership interest. Specifically, the total amount and nature of this consideration, and the period over which it was paid, remain indeterminate.[12]

Not only is the offered evidence of Arapua's redemption payment not probative; it is also untimely. Because Rules 161 and 162, which govern motions to reconsider and vacate, respectively, are silent on the matter of granting relief on the basis of new evidence discovered after a trial, we look to the analogous provision in the Federal Rules of Civil Procedure. See Rule 1(b). Rule 60(b) of the Federal Rules of Civil Procedure sets forth the "Grounds for Relief from a Final Judgment,

_____

[12]If, in fact, Exhibit A of the motion to vacate, which shows aggregate transfers of $200,000, all of which were made in 2003, represents the sum total of all payments made to Arapua, it would tend to indicate that Arapua's status as a "partner" was even more shortlived and tenuous than we had hitherto assumed in Superior Trading I. Likewise, Arapua's receivables were more "distressed", and had a lower intrinsic worth, than we had surmised.

Order, or Proceeding".  Pursuant to rule 60(b)(2) of the Federal Rules of Civil Procedure, one of these grounds is "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial".

The Court of Appeals for the Seventh Circuit has held that "[a] party needs <u>awfully good stuff</u> to win a Rule 60(b)(2) motion."  <u>Publicis Commc'n v. True N. Commc'ns, Inc.</u>, 206 F.3d 725, 730 (7th Cir. 2000) (emphasis supplied) .  However, moving petitioners' "stuff" is awfully far from awfully good.  In point of fact, much as with the claimed basis in the receivables transferred by Arapua, there exists a woeful lack of substantiation.

The motion to vacate is completely silent on why the offered documentation of Multicred's payments to Arapua "with reasonable diligence, could not have been discovered" earlier.  <u>See</u> Fed. R. Civ. P. 60(b)(2).  Therefore, we are well within our discretion at this late date to disregard the documents attached to the motion to vacate.  <u>See, e.g.</u>, <u>United States v. McGaughey</u>, 977 F.2d 1067, 1075 (7th Cir. 1992) (holding that a trial court did not abuse its discretion, when in denying a motion made under rule 60(b)(2) of the Federal Rules of Civil Procedure, it refused to consider "newly discovered evidence" that "was within the reach and control of the defendant and allegedly located within his own files").

IV.   <u>Despair Ruins Some; Presumption, Many</u>

Having concluded, in the alternative, the absence of a valid partnership and

the lack of a bona fide contribution, we went on in <u>Superior Trading I</u>, 137 T.C. at

83, to concede arguendo both alternative holdings and still find against petitioners.

We held that "[p]etitioners have given us no reason to challenge respondent's

assertion that as a result of Arapua's receipt of money within 2 years of transferring

the receivables, 'the transaction * * * is presumed to be a sale under I.R.C. §

707(a)(2) and the regulations promulgated thereunder.'"  <u>Id.</u>  Specifically, we found

that petitioners had failed to rebut the disguised sale presumption of section

707(a)(2), as interpreted and implemented by section 1.707-3(c), Income Tax Regs.

(stating that "if within a two-year period a partner transfers property to a partnership

and the partnership transfers money or other consideration to the partner (without

regard to the order of the transfers), the transfers are presumed to be a sale of the

property to the partnership <u>unless the facts and circumstances clearly establish that</u>

<u>the transfers do not constitute a sale</u>"  (emphasis supplied)).

The motion to reconsider contends that

> [i]n holding that it "appears" that Arapuã was redeemed out and thus
> there was a disguised sale, the Court failed to address the ten factors
> set forth under the regulations promulgated under Section 707(a) (2)
> (B).  Such disregard is <u>clear</u> error because, applying these ten

factors[,] * * * it is <u>clear</u> that no disguised sale occurred. [Emphasis supplied.]

What is clear, however, is that moving petitioners consider a rebuttable presumption synonymous with a naked assertion requiring independent verification. In effect, moving petitioners disagree with an application of the presumption that section 1.707-3(c), Income Tax Regs., directs us to make. The plain language of this regulation establishes a rebuttable presumption of a disguised sale in the event of a transfer of property from a partner to the partnership and a transfer of consideration from the partnership to the partner, both within a two-year window.

Notwithstanding the passive voice of the conditional clause in the regulation, it is readily apparent that the burden falls on the taxpayer of "<u>clearly</u> establish[ing] that the transfers do not constitute a sale." Sec. 1.707-3(c), Income Tax Regs. (emphasis supplied); <u>see also</u> Rule 142(a). Moving petitioners should have had no reason to conjecture otherwise, in the light of our unambiguous statement in <u>Superior Trading I</u>, 137 T.C. at 83 ("We may conclude from petitioners' <u>failure to rebut this presumption</u> that Arapua sold its receivables to Warwick rather than contributed them for a partnership interest." (Emphasis supplied.)).

The 10-factor facts-and-circumstances test of section 1.707-3(b)(2), Income Tax Regs., that moving petitioners refer to, describes their burden not ours. Petitioners failed to carry this burden at trial, and no amount of after-the-fact indignation can overcome that palpable failure.[13]

_____

[13]The regulations are clear that

> if within a two-year period a partner transfers property to a partnership and the partnership transfers money or other consideration to the partner (without regard to the order of the transfers), the transfers are presumed to be a sale of the property to the partnership unless the facts and circumstances <u>clearly</u> establish that the transfers do not constitute a sale.

Sec. 1.707-3(c), Income Tax Regs. (emphasis supplied).

Even if we were to ignore petitioners' failure to carry their burden, it is readily apparent that the 10-factor facts-and-circumstances test set forth in sec. 1.707-3(b)(2), Income Tax Regs., cannot help moving petitioners to rebut the sale presumption of sec. 1.707-3(c), Income Tax Regs. As we show below, Rogers' ability to raise funds from individual U.S. investors (an ability which did not depend upon any value added to the receivables transferred by Arapua) in an amount sufficient to redeem out Arapua from its purported partnership with Jetstream constitutes an insurmountable hurdle to overcoming the presumption.

Sec. 1.707-3(b)(1), Income Tax Regs., provides that a disguised sale has occurred if each of the following two conditions obtains: "(i) [t]he transfer of money or other consideration would not have been made but for the transfer of property; and (ii) [i]n cases in which the transfers are not made simultaneously, the subsequent transfer is not dependent on the entrepreneurial risks of partnership operations."

However, where the rebuttable presumption of sec. 1.707-3(c), Income Tax Regs., applies, it stands to reason that a finding of a disguised sale is required "unless the facts and circumstances clearly establish that" at least one of the two conditions listed in sec. 1.707-3(b)(1), Income Tax Regs., does not exist.

(continued...)

-37-

---

<sup>13</sup>(...continued)
Specifically, either "(A) [t]he transfer to * * * [the partnership] would have been made * * * [regardless of the partner's] transfer * * * to the partnership; or (B) [t]he partnership's obligation or ability to make this transfer * * * depends, at the time of the transfer to the partnership, on the entrepreneurial risks of partnership operations."  Sec. 1.707-3(f), Example (3), Income Tax Regs.

Petitioners have not alleged that Arapua would have received cash payments from its nominal partnership with Jetstream even in the absence of transferring receivables to this purported partnership.  Thus, we consider exclusively whether the nominal partnership's ability to transfer funds to Arapua, at the time of Arapua's claimed contribution of the receivables, depended upon "the entrepreneurial risks of partnership operations."

Of the 10 factors listed in the facts-and-circumstances test of sec. 1.707-3(b)(2), Income Tax Regs., "that may tend to prove the existence of a sale under paragraph (b)(1) of this section", we find three axiomatically indicating a sale by the fact that Arapua was redeemed out of the nominal partnership as a consequence of the cash payments.  In particular, factors (viii), (ix), and (x) concerning, respectively,

> partnership distributions, allocations or control of partnership operations * * *  designed to effect an exchange of the burdens and benefits of ownership of property; * * *  transfer of money or other consideration by the partnership * * * disproportionately large in relationship to the partner's general and continuing interest in partnership profits; and * * * the partner ha[ving] no obligation to return or repay the money or other consideration to the partnership, * * *

all weigh in favor of a sale because petitioners no longer claimed Arapua was a partner of Jetstream following the cash payments to Arapua.

Another two factors, factors (v) and (vi), each discussing partnership indebtedness incurred to make payments to a partner, are inapplicable here because the nominal partnership did not take on debt to redeem out Arapua.  Of the remaining five factors, moving petitioners could at most claim that three have not been fully satisfied.  Specifically, moving petitioners may argue that factors (i), (ii),

(continued...)

[13](...continued)
and (iii), requiring, respectively,

> [t]hat the timing and amount of a subsequent transfer are determinable with reasonable certainty at the time of an earlier transfer; [t]hat the transferor has a legally enforceable right to the subsequent transfer; [and] [t]hat the partner's right to receive the transfer of money or other consideration is secured in any manner, taking into account the period during which it is secured * * * [,]

weigh against a sale because Arapua was never assured about the timing and amount of any redemption payments. Such claims, if they were advanced, would have been undermined by Rogers' trial testimony discussed supra text between notes 11 and 12, and infra this note.

More importantly, we find factors (iv) and (vii) dispositive for defeating a claim that Arapua's redemption payments depended upon "the entrepreneurial risks of partnership operations." These two factors support finding a disguised sale if, respectively,

> any person has made or is legally obligated to make contributions to the partnership in order to permit the partnership to make the transfer of money or other consideration; [and] * * * the partnership holds money or other liquid assets, beyond the reasonable needs of the business, that are expected to be available to make the transfer (taking into account the income that will be earned from those assets) * * * [.]

The venture purportedly set up for servicing Arapua's receivables had available to it funds furnished by individual U.S. investors, who acquired interests in the various holding companies to take advantage of the high basis of the Arapua receivables. Respondent presented credible evidence at trial that, in at least these proceedings, the venture "did not transfer any receivables to a trading company until an investor was found to purchase an interest in the holding company." Consequently, several individual U.S. investors had supplied funds that did not represent "reasonable needs of the business" for servicing the Arapua receivables. A fraction of these funds was eventually used to redeem Arapua.

(continued...)

## V.    A Skip In Our Step

The motion to reconsider criticizes the application of the step transaction doctrine in Superior Trading I, 137 T.C. at 87-91, for "creating" steps that were not, in fact, taken.[14]  In Esmark, Inc. v. Commissioner, 90 T.C. 171, 196 (1988), aff'd

---

[13](...continued)

Under petitioners' own version of the events, the ability to transfer funds to Arapua, at the time of Arapua's claimed contribution of the receivables, did not depend upon the value added to those receivables as a result of any servicing and collection activity.  Moving petitioners themselves have stated that the funds for redeeming Arapua were supplied by Multicred.  See supra text between notes 11 and 12.  Further, as discussed above, Rogers testified at trial that he "had an understanding" with Multicred about providing the funds to redeem out Arapua.  More importantly, Rogers admitted at trial that he had arranged to make available to Multicred the funds that were eventually distributed to Arapua.

On cross-examination, Rogers stated that he had "set up a competition between Multicred and Arapua."  He acknowledged that the "3 percent [of the face amount of Arapua's receivables] that went to Brazil, that actually went in the first instance to Multicred", was subsequently transferred to Arapua.  Consequently, the ability to make payments to Arapua could not have depended upon any value extracted from the receivables.  To the contrary, the funds that ended up with Arapua merely represented a fraction of the total amount that Rogers raised from U.S. investors lured by the prospect of large tax losses.

[14]The motion to reconsider also contends that Arapua's redemption was irrelevant for transferring the high basis of Arapua's receivables to individual U.S. investors.  According to moving petitioners, even in the absence of Arapua's redemption, an individual U.S. investor would have inherited Arapua's high basis by acquiring "membership interest in a trading company by indirectly purchasing a holding company".  Certainly, the shelter could have been structured to allow for Arapua to remain in a claimed partnership with Jetstream.  However, Arapua's basis in its receivables could not have been inherited by another entity without arranging the "exit of Arapua".  Superior Trading I, 137 T.C. at 90.  Whether Arapua's exit

(continued...)

without published opinion, 886 F.2d 1318 (7th Cir. 1989), this Court had indeed

rejected the Commissioner's recharacterization of a transaction because the Court

found that the "recharacterization does not simply combine steps; it invents new

ones." That case involved a corporate restructuring in which a publicly traded

parent corporation divested a wholly owned subsidiary to an acquirer. The acquirer

acquired the parent's shares in a public tender offer. The parent then redeemed

these shares by distributing to the acquirer shares of its wholly owned subsidiaries.

---

[14](...continued)
was effected at the level of the nominal partnership, as indeed it was here, or
whether Arapua remained a purported partner of the nominal partnership, which in
turn exited by transferring the receivables, does not affect our conclusion that
"arranging for * * * [the] tax benefits [at issue] required the carefully choreographed
entry and exit of Arapua. Such entry and exit could not but have been previously
arranged to reach the desired end result--allocation of the recognized tax loss away
from Arapua." Id.

The motion to reconsider suggests that Arapua's high basis in the receivables
could have been inherited by individual U.S. investors, even if Arapua had not been
redeemed out of its nominal partnership with Jetstream. In such a case, Arapua
would have continued to be a purported partner of Jetstream throughout the entire
process, as the nominal partnership claimed to contribute the high-basis receivables
to trading companies and subsequently sold membership interests in the trading
companies to holding companies. Nonetheless, Arapua would have surely "exited",
or divested all direct and indirect ownership claims on the receivables. It would
have done so, despite continuing as a purported partner of Jetstream, when the
membership interests in the trading companies were sold to holding companies.
This variation on the shelter from what actually transpired, where Arapua was
redeemed out, seems to us to be a distinction without a difference for purposes of
applying the step transaction doctrine. Even with Arapua persisting as a purported
partner of Jetstream, the remaining transactional steps would have been just as
"collapsible" as we in fact found them. "In either formulation, * * * we are free to
invoke the step transaction doctrine and collapse the formal steps into a single
transaction." Id.

To render this a taxable transaction, the Commissioner sought to recharacterize it as a sale by the parent of the subsidiary's stock to the acquirer. This entailed reversing the chronological sequence of the steps that actually transpired. Thus, the Commissioner "propose[d] to recharacterize the tender offer/redemption as a sale of the * * * [target's] shares to * * * [the acquirer] followed by a self-tender." Id. The Court declined to follow the Commissioner's revisionist view of history because he had changed the facts to fit the theory.

Other courts have similarly refrained from applying the step transaction doctrine to recharacterize a transaction where the recharacterization requires fabricating fictional economic events. See, e.g., Grove v. Commissioner, 490 F.2d 241, 247-248 (2d Cir. 1973) (rejecting the Commissioner's argument for applying the step transaction doctrine because "[w]ere we to adopt the Commissioner's view, we would be required to recast two actual transactions * * * into two completely fictional transactions"), aff'g T.C. Memo 1972-98; Sheppard v. United States, 361 F.2d 972, 978 (Ct. Cl. 1966) ("Useful as the step transaction doctrine may be in the interpretation of equivocal contracts and ambiguous events, it cannot

generate events which never took place just so an additional tax liability might be asserted.").

These courts balked at applying the step transaction doctrine where the application entailed positing an economic event that had not in fact transpired. Clearly, merely redefining in a manner that renders unambiguous a step that was actually taken does not constitute "creating" this step and does not bar applying the step transaction doctrine.

However, in Superior Trading I, we did not even go that far. We did not invent new steps or reorder the chronological sequence of actual steps. We did not redefine any steps. We simply collapsed the alleged contribution by Arapua of its receivables, a step that had barely preceded Arapua's claimed redemption, with this redemption. We were left with a single step consisting of Arapua's transfer of receivables in exchange for an indeterminate amount of money. Thus, "[w]e conclude[d] that the various intermediate steps of the transaction structured and put into operation by Rogers are properly collapsed into a single transaction. This transaction consisted of Arapua's selling its receivables * * * for the amount of cash payments that were eventually made to Arapua". Superior Trading I, 137 T.C. at 90.

As mentioned above, Rogers, who was the sole owner and director of Jetstream during the relevant time, had devised and marketed the DAD shelter at issue in the consolidated cases. To effectuate the DAD shelter in these cases, Rogers fashioned an elaborate construct of purported partnerships arranged in a tiered structure. This structure constituted the backdrop against which we applied the step transaction doctrine in Superior Trading I. Under the end result test of the step transaction doctrine, we held that

> we can safely invoke the step transaction doctrine here. By petitioners' own admission, the tax benefits [of the DAD shelter] were a legitimate inducement for individual U.S. investors to invest in the venture . But arranging for these tax benefits required the carefully choreographed entry and exit of Arapua. Such entry and exit could not but have been previously arranged to reach the desired end result--allocation of the recognized tax loss away from Arapua.

Id. at 89-90. Similarly, under the interdependence test , we found ourselves "free to invoke the step transaction doctrine and collapse the formal steps into a single transaction." Id. at 90.

The step transaction doctrine was invoked in the context of the pyramid-like partnership structure constructed by Rogers. But these exact contextual facts are not imperative for properly invoking the doctrine to reduce the DAD shelter to its essential core--transferring high-basis/low-value assets, such as the Arapua receivables, from a tax indifferent to a tax sensitive party. The "tax preferred"

feature of the shelter entails shrouding the transfer of such assets within the cloak of a nonrecognition transaction. Allegedly, this nonrecognition transfer maintains these assets' high basis, even in the hands of the transferee. Consequently, a nonrecognition transaction is a necessary element of the shelter. In these consolidated cases, the nonrecognition transaction consisted of the claimed contribution by Arapua of its receivables to a purported partnership. Another necessary component of the shelter is arranging for the removal from the ostensible venture of the tax indifferent party so that the inherited high basis comes to rest with the tax sensitive parties. In these cases, the removal was effected by the claimed redemption of Arapua from the purported partnership.

In the consolidated cases, the combined operations of section 721(a) and section 704(c), respectively, allegedly maintained the high basis of the Arapua receivables after their transfer. However, a partnership structure and the rules of subchapter K are not essential to a DAD scheme and therefore not indispensable for invoking the step transaction doctrine to reveal the scheme's true substance.

Indeed, one can conceive of variants of the DAD shelter employing nonrecognition transfers to a domestic nontaxable or tax-exempt entity, rather than a contribution by a foreign entity to a domestic partnership. Regardless, the step transaction doctrine would remain as valid for rejecting the elected form and

elevating the economic substance. "[T]he step transaction doctrine is particularly tailored to the examination of transactions involving a series of potentially interrelated steps for which the taxpayer seeks independent tax treatment." True v. United States, 190 F.3d 1165, 1176 n.11 (10th Cir. 1999). Consequently, the doctrine readily lends itself to recasting a DAD shelter, whatever the shelter's actual manifestation. Thus, and ironically, DAD becomes a poster-child for invoking the step transaction doctrine.

VI. Cascading Penalties

After we issued Superior Trading I, the Court of Appeals for the Fifth Circuit, in Southgate Master Fund, LLC v. United States, 659 F.3d 466, 468 (5th Cir. 2011), aff'g 651 F. Supp. 2d 596 (N.D. Tex. 2009), "affirm[ed] in all respects the district court's judgment" that had sealed the fate of another DAD shelter, that one involving "Chinese nonperforming loans".

At the trial stage, the U.S. District Court for the Northern District of Texas had sustained the Commissioner's denial of deductions for the claimed losses but declined to uphold the accuracy-related penalty. Southgate, 651 F. Supp. 2d 596. The District Court found that the protagonist of that particular DAD shelter, D. Andrew Beal, a banker, had acted with reasonable cause and in good faith. According to the court: "Beal is an aggressive risk-taker, a noted gambler who

makes big bets. Sometimes he wins, and sometimes he loses--but he plays the game above board." Id. at 668.

The District Court, in its findings of fact, made a point of noting that "Although Beal is a highly sophisticated and experienced banker, he has no professional or educational background in tax law." Id. at 599. Consequently, the court gave controlling weight to the finding "that Plaintiff sought legal advice from qualified accountants and tax attorneys concerning the legal implications of their investments and the resulting tax deductions and hired professionals to write two detailed tax opinions." Id. at 668. (Emphasis in original.) Based on this finding, and assuming that "the penalties were otherwise deemed applicable, the Court conclude[d] that the calculation of taxes was done in good faith and with reasonable cause." Id.

In Superior Trading I, 137 T.C. at 91 (citing New Millennium Trading, LLC v. Commissioner, 131 T.C. 275 (2008)), we made the reasonable cause and good faith "determination at the partnership level, taking into account the state of mind of the general partner." Isolating Rogers' conduct as the sole determinant for this purpose, we found that there had

> been no showing of reasonable cause or good faith on Rogers' part in conceptualizing, designing, and executing the transactions. To the contrary, as we have detailed above, Rogers' knowledge and

> experience should have put him on notice that the tax benefits sought by the form of the transactions would not be forthcoming and that these transactions would be recharacterized and stepped together to reveal their true substance.

Id. at 92.  Nothing in the discussion of the penalties at issue in Southgate, at trial, or on appeal, gives us pause to reconsider our own resolution of the question in Superior Trading I.  If anything, the District Court's analysis of the requirements for reasonable cause and good faith in Southgate confirms the decision in Superior Trading I, 137 T.C. at 92, to sustain the accuracy-related penalty.

In sharp contrast with Beal, the banker at the center of the Southgate DAD, Rogers had practiced tax law for over three decades when he devised his tax alchemy scheme.  See Superior Trading I, 137 T.C. at 75.  As a graduate of Harvard Law School, an institution that sends its students out into the professional world with the exhortation to "Serve Better Thy Country and Thy Kind", and as a member of the legal profession and an officer of this Court, Rogers was under an obligation to exercise much more care and act with far greater discretion than he did.

Section 6673 allows us to award a penalty to the United States in an amount of up to $25,000 "[w]henever it appears to * * * [us] that * * * proceedings * * * have been instituted or maintained by the taxpayer primarily for delay [or] the

taxpayer's position in such proceeding is frivolous or groundless". (Emphasis supplied.) Whatever the merits of the original petitions underlying the consolidated cases, the motions to reconsider and vacate are frivolous and seem to serve no purpose other than delay. Any time that we expend on resolving such matters necessarily takes away from the time we can devote to taxpayers with genuinely unresolved issues. We warn moving petitioners that if they persist with tactics to further prolong these proceedings, we will not hesitate, where appropriate, to impose sanctions under section 6673.

VII. Epilogue

We are mindful of the fact that the ultimate burden of what we say and do here will be borne by those not before us--the individual investors in the various holding companies. That, however, is a necessary consequence of the essential design of TEFRA. TEFRA, quite perversely, hands the keys to the (sand) castle to those with everything to gain and nothing to lose. Nonetheless, our duty is to apply the law as written by Congress and reasonably interpreted by the Secretary. But even as we fulfill that obligation, we caution all unsuspecting taxpayers who have already been, or may in the future be, tempted to invest in such "too-good-to-be-true" sheltering transactions, or to tie up this Court in TEFRA's procedural knots.

The wheels of TEFRA may grind slowly, but grind they will, and the grist they mill could have been the investors' half a loaf.

We have considered all the other arguments made by petitioners, and to the extent not discussed above, we conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Appropriate orders will be entered</u>.