RONALD ISLEY, PETITIONER *v*. COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 5616–11L.          Filed November 6, 2013.

P was a founding member of the popular Isley Brothers
singing group, which for many years generated substantial
income from personal appearances and record sales. P failed
to pay Federal income tax on much of that income. The
Commissioner sought to collect unpaid tax for all but five
years within the 1971–95 period by filing proofs of claim in
two bankruptcy proceedings (bankruptcies I & II), which
resulted in his collection of substantial amounts from P. The
United States also obtained P's criminal conviction for tax
evasion and willful failure to file with respect to 1997–2002
(conviction years), which resulted in his being sentenced, on
Sept. 1, 2009, to 37 months in prison followed by a three-year
probationary period during which P was required to discharge
his liabilities for the conviction years and his tax filing and
payment obligations for the probation years. After bankruptcy
II, P instituted an unsuccessful suit for the refund of amounts
that the Commissioner collected in that bankruptcy pro-
ceeding that P alleged should have been offset by payments
emanating from bankruptcy I. R issued to P two notices of
Federal tax lien (NFTLs) and two notices of levy that together
covered P's assessed liabilities for the conviction years plus
2003, 2004, and 2006. P requested a collection due process
(CDP) hearing, which resulted in his offer and the Appeals
officer's preliminary acceptance of an offer-in-compromise
(OIC). The Appeals officer referred the OIC to C, an attorney
in R's Office of Chief Counsel, for review. C recommended the
OIC be rejected because the conviction years (which were cov-

ered by the OIC), had been referred to the Department of Justice (DOJ) for prosecution so that R was prohibited by I.R.C. sec. 7122(a) from unilaterally compromising P's liabilities for those years, and also because the Appeals officer had overlooked (1) potential sources for the collection of more than P had offered and (2) P's noncompliance with the terms of the OIC. Following C's advice, Appeals rejected the OIC and sustained the NFTL filings and the levy notices. P seeks to have the OIC reinstated on the ground that (1) I.R.C. sec. 7122(a) did not prohibit Appeals from entering into an OIC pursuant to I.R.C. sec. 6330(c)(2) and (3); (2) C's involvement effectively made him the "de facto" Appeals officer, and, because of his earlier involvement in bankruptcy II, his involvement in P's CDP hearing violated the "impartial officer" requirement of I.R.C. sec. 6330(b)(3); and (3) as the "de facto" Appeals officer, his improper ex parte communications with non-Appeals IRS personnel require that we disregard his rejection of the OIC and ratify Appeals' initial acceptance of it. P also renews the argument, made in his unsuccessful refund suit, that the assessed liabilities are overstated because the Commissioner did not properly credit to P's account payments made to the Commissioner at the conclusion of bankruptcy I (offset issue). Lastly, P argues that, should we uphold Appeals' rejection of his OIC, we must order a refund of the 20% partial payment that he made pursuant to I.R.C. sec. 7122(c) because P was induced to submit the OIC under false pretenses.

1. *Held*: I.R.C. sec. 7122(a) barred Appeals' unilateral acceptance of P's OIC.

2. *Held*, *further*, C's advice was properly requested and furnished to the Appeals officer pursuant to I.R.C. sec. 7122(b). Thus, his involvement did not cause him to become the "de facto" Appeals officer and, therefore, could not and did not result in (1) a violation of the "impartial officer" requirement of I.R.C. sec. 6330(b)(3), or (2) improper ex parte communications between Appeals and non-Appeals IRS personnel.

3. *Held*, *further*, because (1) bankruptcy II gave P a prior opportunity to raise the offset issue, and (2) P's position with respect to that issue was rejected in his unsuccessful refund suit, I.R.C. sec. 6330(c)(2)(B) and (4)(A) alternatively barred him from raising that issue during his CDP hearing.

4. *Held*, *further*, P was not invited to submit his OIC under false pretenses. Therefore, pursuant to the normal rules providing for the nonrefundability of the 20% partial payment required by I.R.C. sec. 7122(c) (which P does not dispute), P is not entitled to a refund of that payment.

5. *Held*, *further*, Appeals' determination not to withdraw the NFTLs is sustained.

6. *Held*, *further*, Appeals' determination to sustain the notices of levy and proceed with collection by levy of the

assessed liabilities is rejected and the case is remanded to Appeals to explore the possibility of a new OIC or installment agreement, not to be finalized until approved by DOJ pursuant to I.R.C. sec. 7122(a).

*Steven Ray Mather*, for petitioner.

*Cassidy B. Collins*, *Katherine Holmes Ankeny*, and *Carolyn A. Schenck*, for respondent.

HALPERN, *Judge*: This case is before the Court to review determinations made by the Internal Revenue Service (IRS) Appeals Office (Appeals) in four notices issued to petitioner after a collection due process (CDP) hearing conducted pursuant to sections 6320(b) and (c) and 6330(b) and (c).[1] Together, those determinations sustained (1) respondent's right to proceed to collect by levy petitioner's assessed liabilities for 1997 through 2003 and (2) the filing of notices of Federal tax lien (NFTLs) with respect to those years plus 2004 and 2006. In response thereto, petitioner, pursuant to section 6330(d)(1), timely filed a petition with this Court in which he assigns error on the grounds that respondent should have (1) determined that the assessed liabilities for the years in issue were overstated and (2) accepted petitioner's offer-in-compromise (OIC) as a collection alternative. Petitioner also alleges that (1) if we determine that Appeals did not err in rejecting his OIC, we should order the return to petitioner of his 20% partial payment made pursuant to section 7122(c)(1)(A)(i) (section 7122(c) payment),[2] and (2) we have jurisdiction to adjudicate his challenge to the underlying liabilities based upon respondent's alleged failure to properly credit against those liabilities amounts paid to respondent in prior years that should have been credited to his delinquent account.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect at all relevant times. Dollar amounts have been rounded to the nearest dollar.

[2] The Tax Increase Prevention and Reconciliation Act of 2005, Pub. L. No. 109–222, sec. 509(a), 120 Stat. at 362, enacted new sec. 7122(c), effective for OICs submitted on or after July 16, 2006. Sec. 7122(c)(1)(A)(i) requires that the submission of any lump-sum OIC "be accompanied by the payment of 20 percent of the amount of such offer."

FINDINGS OF FACT

Some facts are stipulated and are so found. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference.

Petitioner resided in St. Louis, Missouri, when he filed his petition.

*Petitioner's Musical Career*

Petitioner's musical career generated considerable income. His failure to pay Federal income tax with respect to much of it led to his perhaps even more considerable problems with the law.

Petitioner was the third of six brothers, three of whom (petitioner and his two older brothers, O'Kelly and Rudolph) moved to New York as teenagers and launched what became a successful recording and concert career as the Isley Brothers. Years later, the group also included two younger brothers, Ernie and Marvin. Their musical genres included rhythm and blues, doo-wop, funk, and contemporary R&B. Various versions of the group had top 40 singles and/or top 20 albums during a period stretching from 1962 to 2006, which ultimately led to various accolades including the induction of petitioner and four of his brothers into the Rock and Roll Hall of Fame. Late in his career, petitioner focused on solo work, and as late as 2011 he was still performing with his younger brother Ernie.

*The New Jersey Bankruptcy*

On August 23, 1984, petitioner and his two older brothers, O'Kelly and Rudolph, each filed for bankruptcy protection in a proceeding under chapter 11 of the Bankruptcy Code, with the U.S. Bankruptcy Court for the District of New Jersey, subsequently converted to a chapter 7 bankruptcy proceeding (New Jersey bankruptcy). Upon motion by the trustee, the three bankruptcy estates were consolidated. Thereafter, the bankruptcy court issued an order determining the extent, validity, and priority of respondent's claims against the three brothers. Respondent's approved claims against petitioner were for tax years 1971–76, 1978, and 1980–83. The trustee satisfied all of respondent's prepetition claims against the consolidated bankruptcy estate, and ordered that, because

respondent also had postpetition claims against the consolidated estate, any funds left in the estate after discharge of the prepetition claims would also be paid to respondent. Respondent applied almost all of those postpetition liability payments in discharge of O'Kelly's outstanding liabilities, with little or nothing applied to the outstanding liabilities of petitioner and Rudolph.

*The California Bankruptcy*

On April 2, 1997, petitioner filed a voluntary petition for bankruptcy protection in a proceeding under chapter 11 of the Bankruptcy Code (also subsequently converted to a chapter 7 bankruptcy proceeding) with the U.S. Bankruptcy Court for the Central District of California (California bankruptcy). Respondent filed proofs of claim in the California bankruptcy for tax years 1976, 1978,[3] 1985, 1986, 1988, 1989, and 1991–95. The bankruptcy court approved a settlement agreement whereby a number of petitioner's "songwriter interests" (then belonging to the bankruptcy estate) were sold, and, on June 23, 2000, $2 million was paid to respondent (June 23, 2000, payment) and applied to petitioner's outstanding liabilities to respondent for all of the foregoing years except 1992. During the bankruptcy proceeding, neither petitioner nor the trustee objected to respondent's proofs of claim (satisfied by the June 23, 2000, payment) on the basis that respondent had misapplied (to O'Kelly's account) payments received from the New Jersey bankruptcy trustee.

*Petitioner's Suit For Refund*

On June 19, 2002, petitioner filed a claim with respondent for refund of the June 23, 2000, payment, and, on March 1, 2005, he filed a suit for refund of that payment in the U.S. District Court for the Central District of California. In his refund suit, petitioner alleged that, pursuant to the June 23, 2000, payment, respondent "illegally and unlawfully collected the full balance of tax, penalty and interest determined by [respondent] for the [p]eriods in [i]ssue." The Government

---

[3] For both 1976 and 1978, respondent sought post-(New Jersey) petition interest not covered by the consent order terminating the New Jersey bankruptcy.

moved to dismiss the complaint and/or for summary judgment, in part, on the ground that petitioner's claims (1) were barred by the doctrine of res judicata because the New Jersey and California bankruptcies finally determined the amounts owed to respondent and (2) were untimely. The Government also argued that petitioner could not challenge respondent's application of payments from the New Jersey bankruptcy "because * * * [the IRS] was entitled to apply the payments as it saw fit." In granting the Government's motion for summary judgment, the court first stated that petitioner was barred by the doctrine of res judicata from challenging his liabilities to respondent for 1976 and 1978 as determined in the New Jersey bankruptcy. The court further stated that petitioner's challenge to respondent's claims in the California bankruptcy was barred by that same doctrine because (1) during the California bankruptcy, "neither the Chapter 7 trustee nor * * * [petitioner] objected to the IRS' claims that were satisfied by the June 23, 2000 payment", (2) "[p]roofs of claim to which no objection is filed are 'deemed allowed'", and (3) "'deemed allowed' claims are themselves entitled to res judicata effect". The court also determined that petitioner lacked standing to assert the refund claim because both the assets sold and the amounts received therefor, which funded the June 23, 2000, payment, were assets of the bankruptcy estate. Therefore, the court concluded that "the bankruptcy estate, and not * * * [petitioner], made the alleged overpayment" and was the party with standing to pursue the refund claim.

The Court of Appeals for the Ninth Circuit affirmed the District Court's decision and, in particular, that court's determination that the California bankruptcy estate, not petitioner, had standing to pursue the refund. *Isley v. United States*, 272 Fed. Appx. 640 (9th Cir. 2008). The Court of Appeals further determined that (1) petitioner's claim "also fails to state a basis for refund" because the IRS has "the right to apply payments in the manner it chooses" and (2) even if petitioner has standing to pursue the refund, his claim would be barred by res judicata because the bankruptcy court's allowance of the Government's claim "necessarily decided the legality of the tax claim at issue in this appeal". *Id.* at 641–642.

*Criminal Proceedings Against Petitioner*

Petitioner was indicted, tried, and convicted in the District Court for the Central District of California on five counts of tax evasion and one count of willful failure to file a tax return covering tax years 1997–2002 (conviction years). Following the guilty verdict, the court, on September 1, 2006, issued a judgment and probation commitment order (JPC order) sentencing petitioner to 37 months' imprisonment and, upon release from imprisonment, placing petitioner on "supervised release for a term of three years" (three-year probationary period). The JPC order set forth a number of terms and conditions with respect to the three-year probationary period, including the following:

> 2. The defendant shall truthfully and timely file and pay taxes owed for the years of conviction; and shall truthfully and timely file and pay taxes during the period of community supervision. Further, the defendant shall show proof to the Probation Officer of compliance with this order;

> \*   \*   \*   \*   \*   \*   \*

> 10. The Defendant shall pay all taxes when due, and, if necessary, sell assets to satisfy his tax obligations.

The JPC order also provided for the adjustment of petitioner's restitution obligation as follows:

> The defendant shall notify the Court through the Probation Office, and notify the United States Attorney of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay a fine or restitution, as required by 18 U.S.C. § 3664(k). The Court may also accept such notification from the government or the victim, and may, on its own motion or that of a party or the victim, adjust the manner of payment of a fine or restitution—pursuant to 18 U.S.C. § 3664(k).

On February 11, 2008, the Court of Appeals for the Ninth Circuit affirmed the District Court's 37-month sentence.

*Respondent's Notices of Lien and Levy*

Between December 12, 2006, and August 31, 2007, respondent issued to petitioner two NFTLs and two notices of intent to levy (each including a notice of petitioner's right to a hearing) covering the assessed liabilities for the years in

issue. Together, the notices covered the conviction years (1997–2002), plus 2003, 2004, and 2006. [4]

*The CDP Hearing*

In 2007, while in prison, petitioner timely filed Forms 12153, Request for a Collection Due Process or Equivalent Hearing, with respect to all of the tax years covered by the NFTLs and levy notices. In each of his hearing requests, petitioner alleged one or more of the following: (1) the assessed liability is excessive, (2) the penalties should be abated for reasonable cause, (3) prior payments were applied to the wrong periods, and (4) the liability for one of the years (2006) was paid. In each hearing request, in the section denominated "Collection Alternative", petitioner checked the boxes for "Installment Agreement" and "Offer in Compromise". Petitioner requested and received (via his counsel, Mr. Mather) a "face-to-face" hearing, which was conducted by Settlement Officer Nathan August (Appeals officer or Mr. August) on April 27, 2009, with additional meetings between June 4, 2009, and February 3, 2011. [5] During one or more of those meetings, petitioner's counsel renewed petitioner's argument (rejected by the California Federal courts in connection with petitioner's refund suit) that respondent had improperly applied the payments emanating from the New Jersey consolidated bankruptcy by not crediting petitioner's account for a portion thereof (offset issue).

As part of the CDP hearing, Mr. August verified that the liabilities listed in the lien and levy notices were validly assessed and that all legal and administrative procedure requirements were met. At the conclusion of Mr. August's consideration of the case, petitioner's total assessed liabilities, including tax, interest, and penalties, exceeded $9 million, which included penalty assessments under section 6651(f) for fraudulent failure to file totaling $1,811,983. The section 6651(f) penalty assessments were not part of peti-

[4] As noted *supra*, the levy notices covered 1997–2003, and the NFTLs covered 1997–2004 and 2006.

[5] Petitioner did not specifically request a face-to-face hearing in his response to the NFTL covering 2002–04. Nevertheless, Mr. August treated the face-to-face hearing with petitioner's counsel as covering that NFTL as well as the other NFTL and the two levy notices.

tioner's CDP hearing because respondent had not yet issued CDP notices with respect to those assessments.

The face-to-face meetings, telephone conversations, and correspondence between Mr. August and petitioner's counsel eventually resulted in petitioner's July 31, 2009, submission of a Form 656, Offer in Compromise, in the sum of $1 million, which covered all of the CDP hearing years plus 2007, accompanied by a $200,000 (20%) section 7122(c) payment. On September 29, 2009, after further review of petitioner's existing and potential postincarceration financial circumstances, Mr. August told petitioner's counsel to submit an amended OIC for $1,047,216 and an additional section 7122(c) payment so that the total section 7122(c) payment would equal 20% of the new OIC amount. On October 30, 2009, Mr. August received the amended OIC for $1,047,216 and checks totaling $9,444 representing the additional section 7122(c) payment.[6] In submitting the original and amended OICs, petitioner undertook to "comply with all provisions of the Internal Revenue Code relating to filing * * * [his] returns and paying * * * [his] required taxes for 5 years or until the offered amount is paid in full, whichever is longer."

On November 4, 2009, Mr. August recommended acceptance of the amended OIC in conjunction with a Future Income Collateral Agreement (FICA) of five years' duration, from 2010 through 2014. The FICA called for payments equal to percentages of petitioner's annual income for those years in excess of $750,000, which increased as petitioner's income (in excess of $750,000) increased. On November 5, 2009, the Appeals team manager preliminarily approved both the OIC and the FICA.

On November 13, 2009, Mr. August submitted the OIC and the FICA to IRS Chief Counsel Attorney Ronald Chun for a legal sufficiency determination.

Mr. Chun was no stranger to petitioner's Federal income tax difficulties. He had been one of four IRS attorneys who, at one time or another, were assigned to work on respondent's proofs of claim filed in connection with the California bankruptcy. Much of his involvement in that bankruptcy proceeding stemmed from a March 25, 2002, letter from peti-

---

[6] The amended OIC did not cover 2004.

tioner's counsel, Mr. Mather, to him in which Mr. Mather challenged respondent's amended proof of claim in two respects: (1) he raised the offset issue, alleging that payments related to respondent's "secured [priorities] claim" had been misapplied, most prominently, by applying the entire payment from the New Jersey bankruptcy to O'Kelly Isley's account rather than to the accounts of all three Isley brothers involved in the bankruptcy, one-third each, and (2) he alleged that respondent's "unsecured priority claim", which was based upon a bank deposits analysis, was "grossly and demonstrably inflated." Mr. Chun's involvement appears to have been confined to working with Mr. Mather in order to resolve the second issue, which was ultimately resolved to their mutual satisfaction in March 2003 by respondent's agreement to file amended proofs of claim based upon (mutually agreed-to) deficiency computations for tax years 1992–94 in sharply reduced amounts as compared with respondent's previously filed unsecured priority claim.

Mr. Chun furnished his recommendation to Mr. August in a memorandum dated January 10, 2011. He recommended rejection of petitioner's OIC (and, by implication, the FICA) on the ground that the IRS "lacks settlement authority to compromise the liabilities under * * * Section 7122(a)." In reaching that conclusion, Mr. Chun relied on section 7122(a), the regulations thereunder, and provisions of the Internal Revenue Manual. He also pointed to what he considered impermissible inconsistencies between the JPC order and the OIC.

Alternatively, Mr. Chun determined that petitioner's OIC should be rejected "because the Realizable Collection Potential exceeds the proposed offer amount of $1,047,216, * * * [petitioner] provided incomplete or inaccurate information to the Settlement Officer, and * * * [petitioner] is not in compliance with his filing obligations." Mr. Chun's finding of noncompliance was based upon his finding that petitioner had not timely filed his 2009 return. In connection with his alternative determination that petitioner's offer was insufficient in the light of the realizable collection potential, Mr. Chun found that petitioner had understated the values of his assets and omitted potential sources of future income. He suggested that petitioner provide additional information to Mr. August, including an amended Form 433–A, Collection

Information Statement for Wage Earners and Self-Employed Individuals, and an amended Form 433–B, Collection Information Statement for Businesses.

Mr. Chun secured the assistance of the revenue officer assigned to petitioner's case in obtaining an appraisal of petitioner's residence and spoke to the appraiser. He also mailed a copy of his recommendation to Mr. August to the revenue officer and to a special agent.

On the basis of both Mr. Chun's factual findings and his legal conclusion that section 7122(a) precluded the acceptance of petitioner's amended OIC, and upon his own finding confirming that petitioner had failed to comply with the terms of the OIC by not filing his 2009 return and, also, by underpaying his 2010 estimated taxes, Mr. August rejected the amended OIC and recommended sustaining the proposed levies and the NFTL filings. He also rejected petitioner's argument that respondent misapplied the payments he received from the Isley brothers' New Jersey bankruptcy estate by not applying a pro rata share to petitioner's liabilities (the offset issue) on the ground that "the IRS had the authority to apply the payment as it chose." A copy of his "Summary and Recommendation" was attached to each of the four notices of determination issued to petitioner sustaining the levy notices and NFTLs and rejecting petitioner's amended OIC.

## OPINION

### I. *Introduction*

The parties have raised a number of issues for us to consider in deciding whether to sustain the challenged notices of determination: (1) whether section 7122(a) barred the Appeals officer's acceptance of petitioner's amended OIC (preemption issue); (2) whether Mr. Chun, in recommending rejection of the amended OIC, attained the status of the de facto Appeals or settlement officer in this case so that his prior involvement in the California bankruptcy resulted in a violation of the section 6330(b)(3) requirement that a CDP hearing be "conducted by an officer or employee who has had no prior involvement with respect to the unpaid tax" (impartiality issue); (3) whether Mr. Chun's communications with the revenue officer assigned to petitioner's case and with an

IRS special agent constituted improper ex parte communications requiring that we disregard Mr. Chun's determination to reject the OIC and ratify Mr. August's determination to accept it (ex parte communication issue); (4) whether we should exercise jurisdiction to decide the offset issue and, if so, whether we should resolve it in petitioner's favor; and (5) should we sustain the Appeals officer's rejection of the amended offer-in-compromise, whether we should order respondent to return to petitioner the section 7122(c) payment (section 7122(c) payment issue). Superimposed over issues (1) through (4) is the overall question of whether the Appeals officer, Mr. August, abused his discretion in rejecting the amended OIC and sustaining the NFTLs and the collection, by levy, of petitioner's outstanding assessed liabilities for the tax years at issue. We will separately consider each of the foregoing issues.

II. *Sections 6320, 6330, and 6331*

Section 6331(a) authorizes the Secretary to levy against property and property rights when a taxpayer liable for taxes fails to pay those taxes within 10 days after notice and demand for payment. Section 6331(d) requires the Secretary to send to the taxpayer written notice of the Secretary's intent to levy, and section 6330(a) requires the Secretary to send the taxpayer written notice of his right to a hearing before Appeals at least 30 days before any levy begins. A taxpayer receiving an NFTL has hearing rights similar to the hearing rights accorded to a taxpayer receiving a notice of intent to levy. *See* sec. 6320(c). At the hearing, the taxpayer may raise any relevant issue including collection alternatives, which may include an OIC. After the hearing, an Appeals officer must determine whether and how to proceed with collection, taking into account, among other things, collection alternatives the taxpayer proposed and whether any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of the taxpayer that the collection action be no more intrusive than necessary. *See* sec. 6330(c)(3). The taxpayer may contest the underlying tax liability at the hearing if he or she did not receive any statutory notice of deficiency for the liability or did not otherwise have an opportunity to dispute it. Sec.

6330(c)(2)(B). Where the underlying tax liability is properly at issue, we review the Appeals officer's determination de novo. *E.g.*, *Goza v. Commissioner*, 114 T.C. 176, 181–182 (2000). Where the underlying tax liability is not properly at issue, we review the determination for abuse of discretion. *Id.* at 182. In reviewing for abuse of discretion, we must uphold the Appeals officer's determination unless it is arbitrary, capricious, or without sound basis in fact or law. *See Woodral v. Commissioner*, 112 T.C. 19, 23 (1999).

III. *The Preemption Issue*

A. *Section 7122(a) and the Pertinent Regulations*

Section 7122(a) provides: "The Secretary may compromise any civil or criminal case arising under the internal revenue laws prior to reference to the Department of Justice for prosecution or defense; and the Attorney General or his delegate may compromise any such case after reference to the Department of Justice for prosecution or defense."

Section 301.7122–1(d)(2), Proced. & Admin. Regs., states in pertinent part: "The IRS may not accept for processing any offer to compromise a liability following reference of a case involving such liability to the Department of Justice for prosecution or defense."

B. *The Parties' Arguments*

On the basis of the foregoing provisions, respondent argues that Appeals was without authority to accept (or, indeed, even to process) petitioner's amended OIC because it sought to compromise tax liabilities for the conviction years, which had been referred to the Department of Justice (DOJ) for prosecution. Respondent attempts to harmonize section 7122(a) and section 6330(c)(2)(A), which permits a taxpayer to "raise at * * * [a CDP] hearing any *relevant* issue relating to the unpaid tax or the proposed levy, including * * * (iii) offers of collection alternatives, which *may* include * * * an offer-in-compromise" (emphasis added), by arguing that, in the light of section 7122(a), the propriety of an OIC in this case is not a "relevant issue". Respondent also argues that, because the Appeals officer's consideration of collection alternatives "may include" an OIC, there was "Congressional

recognition that not every collection alternative will be * * * available in every hearing."

Petitioner argues that, pursuant to section 6330(c)(2)(A), he had an absolute right to submit an OIC and that, pursuant to section 6330(c)(3)(B), respondent was required to take petitioner's OIC into consideration.[7] Petitioner argues that section 7122(a) prohibits respondent to compromise only tax liabilities that are subject to "pending" criminal prosecutions and that, because the criminal case against petitioner was complete with his sentencing on September 6, 2006, more than eight months before petitioner's liabilities for all but one of the years at issue herein were assessed, section 7122(a) is inapplicable to this case. Petitioner also argues that respondent's position is unjustified because "acceptance of petitioner's offer in compromise in fact has no effect whatsoever on petitioner's sentence and probation." Petitioner posits that his "compliance with the terms of the Judgment and Probation Commitment Order * * * is a matter that lies within the exclusive jurisdiction of the federal district court, the Department of Justice and the United States Probation Office." Lastly, petitioner notes that neither the prosecutor in the criminal case nor petitioner's probation officer actually objected to the acceptance of petitioner's OIC.

C. *Analysis*

1. *Introduction*

Both parties attempt to resolve the potential conflict between sections 6330(c) and 7122(a). Respondent argues that, after the taxpayer's nonpayment of tax has been referred to DOJ for prosecution or defense, consideration of the taxpayer's OIC is no longer a "relevant issue" at a CDP hearing. Petitioner argues that only where a criminal prosecution against the taxpayer is still pending (i.e., where the outcome is still in doubt) is the Appeals officer at a CDP hearing prohibited from considering the taxpayer's OIC. The parties' efforts to harmonize the two provisions are consistent with the Supreme Court's admonition that "when two stat-

---

[7] As noted in the text, sec. 6330(c)(2)(A)(iii) permits the taxpayer to make "offers of collection alternatives, which may include * * * an offer-in-compromise." Sec. 6330(c)(3)(B) requires the Appeals officer to "take into consideration * * * issues raised * * * [at the hearing]".

utes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974); *see also BLAK Invs. v. Commissioner*, 133 T.C. 431, 439–440 (2009) ("The various sections of the Code should be construed so that one section will explain and support and not defeat or destroy another section."). We do not subscribe to either party's rationale for reconciling the two provisions, however; and although we agree with respondent that, once a case has been referred to DOJ for prosecution or defense, section 7122(a) trumps section 6330(c), we conclude that the former provision does not prohibit the Appeals officer in a CDP hearing from at least negotiating the terms of a potential OIC with a taxpayer after referral of his or her case to DOJ for prosecution. It only prevents Appeals from unilaterally approving the OIC.

### 2. *Impact of Section 7122(a)*

The Courts of Appeals for both the Third Circuit and the Ninth Circuit have held, albeit in unpublished opinions, that, pursuant to section 7122(a), from the moment a taxpayer's case is referred to DOJ for prosecution (or defense), the Commissioner loses his authority to compromise the taxpayer's tax liabilities unless authorized by DOJ. *See United States v. Jackson*, 511 Fed. Appx. 200, 203 (3d Cir. 2013); *Faust v. United States*, 28 F.3d 105, 1994 WL 327584, at *2, 74 A.F.T.R.2d 94–5194, at 94–5196 (9th Cir. 1994). [8] In *Jack-*

---

[8] Pursuant to Fed. R. App. P. 32.1(a) (applicable to and adopted by all Federal Courts of Appeals), "[a] court may not prohibit or restrict the citation of federal judicial opinions * * * that have been: (i) designated as 'unpublished,' 'not for publication,' 'non-precedential,' 'not-precedent,' or the like; and (ii) issued on or after January 1, 2007." That rule is applicable to the opinion of the Court of Appeals for the Third Circuit in *United States v. Jackson*, 511 Fed. Appx. 200 (3d Cir. 2013). The advisory committee notes accompanying the promulgation of Fed. R. App. P. 32.1 make clear, however, that the rule "says nothing about what effect a court must give to one of its unpublished opinions". The local appellate rules adopted by the Court of Appeals for the Third Circuit on November 20, 2008, do not specifically address the precedential value of its unpublished opinions. The Court of Appeals for the Ninth Circuit does not generally treat its post-January 1, 2007, unpublished opinions as precedent. *See* 9th Cir. R. 36–3. Barring written stipulation to the contrary, the venue for appeal of

Continued

*son*, which was decided after the enactment of section 6330 in 1998, the court further stated that "the DOJ retains authority to compromise even if a judgment has been obtained and the case has been returned to the IRS for collection." *Jackson*, 511 Fed. Appx. at 203; *accord* Chief Counsel Notice CC–2011–020 (Sept. 15, 2011).

As respondent notes: "The language of section 7122(a) is clear on its face * * * [and] there is no evidence, statutory or otherwise, that Congress intended for sections 6320 and 6330 to supersede section 7122(a)." As respondent also notes, to treat section 6330(c) as carving out an exception to the application of section 7122(a) would be to violate an established rule of statutory construction that amendments by implication are not to be favored. *See Estate of Morgens v. Commissioner*, 133 T.C. 402, 421 (2009) (citing *United States v. Welden*, 377 U.S. 95, 103 n.12 (1964)), *aff'd*, 678 F.3d 769 (9th Cir. 2012).

Moreover, it makes perfect sense from a policy standpoint that DOJ's primacy in compromising tax liabilities that have been referred to the Attorney General for prosecution should continue until the terms of the court's judgment (or of any settlement authorized by the Attorney General or his delegate) have been satisfied. In this case, any compromise by respondent of petitioner's liabilities would have violated the express terms of the JPC order, which requires that, during the three-year probationary period, petitioner make full payment of "taxes owed for the years of conviction". [9]

It is also clear that there is nothing in section 7122(a) that would have prevented petitioner, either on his own or in conjunction with Mr. August acting on behalf of respondent, from asking the District Court and/or the Attorney General

---

this case would be the Court of Appeals for the Eighth Circuit. *See* sec. 7482(b). We are not so much concerned with the application of the principles of stare decisis to the two cases as we are with the persuasiveness of their reasoning.

[9] Although the record does not indicate the exact dates of petitioner's incarceration, it appears that he entered prison on or shortly after December 1, 2006, and was released at the end of December 2009 or in early 2010. Therefore, the three-year probationary period could not have terminated until December 2012, at the earliest, with the result that it was necessarily in effect during Mr. August's consideration of petitioner's OIC, in 2010 and 2011, and when respondent issued the notices of determination on February 10 and 11, 2012.

or his delegate to modify the full payment requirement contained in the JPC order, which, by its terms, provides that the court, upon notification by the defendant (i.e., petitioner), the Government, or the victim (respondent, in either case), or on its own motion "may * * * adjust the manner of payment of * * * restitution". Although that provision, arguably, does no more than permit the payment terms in the JPC order to be revised, we do not doubt the Attorney General's or the District Court's right to settle or compromise (as well as extend the time for payment of) a defendant's restitution obligation.[10] *See Creel v. Commissioner*, 419 F.3d 1135, 1140–1142 (11th Cir. 2005). In *Creel*, the Court of Appeals for the Eleventh Circuit affirmed our decision rejecting an Appeals officer's determination, after a CDP hearing, to sustain a proposed levy where a restitution order, arising out of the taxpayer's prior criminal case, that required the taxpayer to pay the IRS "$83,830 plus any applicable penalties and interest" was deemed, by the U.S. Attorney's Office, to have been satisfied after the taxpayer's payment of $83,830. The Commissioner had sought approval of a levy to collect the unpaid penalties and interest. On the basis of what we had found, the Court of Appeals found that the U.S. Attorney's Office

> believed that the receipt of petitioner's civil taxes (exclusive of penalties and interest) in the amount of $83,830 was the most that it could recover from petitioner and agreed with him following his sentencing that his timely payment of that amount would serve to settle his civil tax liability of $83,830 plus related penalties and interest. * * * Thus, although not compelled to do so, the government discharged Creel's civil tax liabilities as part of the criminal case. [*Id.* at 1141.]

Thus, we do not consider section 7122(a) to be an absolute bar to an Appeals officer's consideration, pursuant to section 6330(c), of an offer to compromise a taxpayer's assessed liabilities, after referral of those liabilities to DOJ for prosecution. It does, however, require prior approval by the Attorney General or his delegate of the proposed compromise, which, in this case, was not sought by either petitioner or the Appeals officer.

---

[10] Sec. 7122(a) appears to explicitly grant that right to the Attorney General or his delegate where the case has been referred to DOJ for prosecution or defense.

As noted *supra*, section 301.7122–1(d)(2), Proced. & Admin. Regs., provides: "The IRS may not accept for processing any offer to compromise a liability following reference of a case involving *such liability* to the Department of Justice for prosecution or defense." (Emphasis added.) The emphasized language makes clear that the Attorney General's exclusive right of compromise applies only to liabilities that have been referred to DOJ for prosecution or defense, in this case, petitioner's assessed liabilities for the conviction years. But the notices of levy cover 2003 in addition to the conviction years, and the NFTLs cover 2003, 2004, and 2006. Therefore, section 7122(a) did not negate Mr. August's authority, pursuant to section 6330(c), to compromise petitioner's assessed liabilities for 2003, 2004, and 2006. Nonetheless, because both petitioner's OIC and his amended OIC would have compromised his unpaid liabilities for the conviction years as well for the subsequent years, section 7122(a) barred Mr. August from unilaterally accepting either.

D. *Conclusion*

Section 7122(a) barred Appeals from unilaterally accepting petitioner's amended OIC. On the basis of that limitation and upon Mr. August's finding of petitioner's noncompliance with the tax filing and payment requirements of the OIC, Appeals did not abuse its discretion by rejecting that OIC.

IV. *Mr. Chun's Involvement: The Impartiality and Ex Parte Communication Issues*

A. *Introduction*

Because section 7122(a) barred Appeals from unilaterally accepting petitioner's amended OIC as a matter of law, Mr. Chun's involvement in Mr. August's determination to reject that OIC, whether or not proper, is of no consequence. Therefore, both the impartiality and ex parte communication issues are technically moot. Nonetheless, assuming there were a need to decide those issues herein, we would resolve both in respondent's favor.

B. *Analysis and Conclusion*

1. *Mr. Chun's Involvement Did Not Result in a Violation of the Section 6330(b)(3) Impartial Officer Requirement.*

Section 7122(b) provides, in pertinent part, that, in the case of a decision to compromise a taxpayer's liability in excess of $50,000, "there shall be placed on file in the office of the Secretary the opinion of the [Treasury's] General Counsel * * * or his delegate, with his reasons therefor". See also section 301.7122–1(e)(6), Proced. & Admin. Regs., providing that, where an OIC involving a liability in excess of $50,000 is accepted, "there will be placed on file the opinion of the Chief Counsel for the IRS with respect to such compromise, along with the reasons therefor."

Because Mr. August initially recommended acceptance of and the Appeals team manager preliminarily approved the amended OIC, it was incumbent upon them to obtain the Chief Counsel opinion required by section 7122(b) and the regulations thereunder, and they acted appropriately in referring the matter to Chief Counsel for that purpose. Mr. Chun, as a member of respondent's Office of Chief Counsel, was assigned to handle that referral, and he recommended rejection of the amended OIC in that capacity. Mr. Chun's involvement did not cause him to become, as petitioner argues, the de facto Appeals officer in the case. As a result, the section 6330(b)(3) requirement that petitioner's CDP hearing "be conducted by an officer or employee who has had no prior involvement with respect to * * * [petitioner's] unpaid tax" does not apply to Mr. Chun, and his prior involvement in the California bankruptcy, which, in any event, concerned petitioner's unpaid taxes for different tax years, could not have resulted in a violation of that requirement.

2. *Mr. Chun Was Not Subject to the Rule Prohibiting Ex Parte Communications.*

The Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105–206, sec. 1001(a)(4), 112 Stat. at 689, requires that the mandated plan to reorganize the IRS "ensure an independent appeals function within the Internal Revenue Service, including the prohibition * * * of

ex parte communications between appeals officers and other Internal Revenue Service employees to the extent that such communications appear to compromise the independence of the appeals officers."

Rev. Proc. 2000–43, sec. 3, Q&A–1, 2000–2 C.B. 404, 405, makes clear that the prohibition against ex parte communications extends to communications between "Appeals and another Service function". Because, as discussed *supra*, Mr. Chun was not an Appeals employee, his communications with the revenue officer and the special agent did not constitute prohibited ex parte communications.

V. *The Offset Issue*

A. *Introduction*

On February 27, 2012, we denied petitioner's motion to raise the offset issue (which had been raised at his CDP hearing) by amending his petition in order to add an allegation challenging "the amount of the liability based on Respondent's unlawful application [to petitioner's brother O'Kelly's account] of payments [made in connection with the New Jersey bankruptcy] in prior years". During the trial, petitioner renewed that motion. We sustained respondent's objection to that motion but ruled that petitioner was still free "to ask leave to amend the petition, to assign error to * * * [Mr. August's] failure to credit the payments * * * [but] without recourse to * * * facts [beyond the administrative record]".

B. *Analysis*

Regardless of whether the offset issue presents a challenge to petitioner's "underlying liability" within the meaning of section 6330(c)(2)(B) (subject to de novo review) as petitioner argues, or constitutes a "relevant issue relating to the [allegedly] unpaid tax" within the meaning of section 6330(c)(2)(A) (subject to review for abuse of discretion) as respondent argues, petitioner is barred from raising the issue.[11]

---

[11] See *Kovacevich v. Commissioner*, T.C. Memo. 2009–160, 2009 WL 1916351, at *5–*6, for a discussion of the caselaw involving the classification, under sec. 6330(c)(2), of challenges to the proper crediting of taxpayer payments to the Commissioner.

### 1. *Underlying Liability Analysis*

Pursuant to section 6330(c)(2)(B), a taxpayer may challenge his underlying liability at a CDP hearing if the taxpayer "did not receive * * * [a] statutory notice of deficiency for * * * [the] liability or did not otherwise have an opportunity to dispute such * * * liability." Here, the District Court for the Central District of California, in denying petitioner's refund claim based upon the Commissioner's misapplication of funds paid into the New Jersey bankruptcy proceeding, specifically found that the Isleys (including petitioner) were in a position to, but did not, object to respondent's proofs of claim in the California bankruptcy, which claims necessarily included amounts that, in petitioner's view, would not have been due but for respondent's allegedly improper application of the New Jersey bankruptcy funds. The court held that, as a result of that failure to object, respondent's claims were "deemed allowed", entitling them to res judicata effect. It is sufficient for us to decline to consider the offset issue on the ground that the California bankruptcy afforded to petitioner a prior opportunity to dispute his liabilities. *See Kendricks v. Commissioner*, 124 T.C. 69, 77 (2005) ("[W]hen the * * * [bankruptcy] provides the taxpayer the opportunity to object to the IRS's proof of claim for an unpaid Federal tax liability, the taxpayer is afforded an opportunity to dispute the liability, as contemplated by Congress in section 6330(c)(2)(B).").

### 2. *Unpaid Tax Analysis*

If we assume, however, that the offset issue does not involve a challenge to petitioner's underlying liabilities but, instead, constitutes a "relevant issue relating to the unpaid tax" within the meaning of section 6330(c)(2)(A), [12] we agree with respondent that our consideration of the issue is barred by section 6330(c)(4)(A). That provision states, in pertinent part, that "[a]n issue may not be raised at the hearing if * * * the issue was raised and considered * * * [in a] previous administrative or judicial proceeding; and * * * the

---

[12] *See Freije v. Commissioner*, 125 T.C. 14, 26 (2005) ("[A] 'relevant issue relating to the unpaid tax * * *' surely includes a claim * * * that the 'unpaid tax' has in fact been satisfied by a remittance that the Commissioner improperly applied elsewhere.").

370 UNITED STATES TAX COURT REPORTS (349)

person seeking to raise the issue participated meaningfully in such hearing or proceeding".

As noted *supra*, petitioner raised the offset issue in his refund suit before the District Court for the Central District of California, which rejected petitioner's claim of offset on the grounds that (1) it was barred by the doctrine of res judicata and (2) petitioner lacked standing to sue for the refund, the liabilities at issue having been discharged by proceeds from the sale of assets belonging to the bankruptcy estate. The Court of Appeals for the Ninth Circuit affirmed on both grounds and on the further ground that the IRS "'enjoys the right to apply payment in the manner it chooses.'" *Isley v. United States*, 272 Fed. Appx. 640 (9th Cir. 2008) (quoting *United States v. Plummer (In re Plummer)*, 174 B.R. 284, 286 (Bankr. C.D. Cal. 1992)).

Petitioner argues that the holding at both the trial and appellate court levels was that petitioner lacked standing to sue for a refund (i.e., that his suit was procedurally deficient), a position implying that those courts' alternative bases for denying relief were dicta. Petitioner concludes that "in none of these prior proceedings was * * * [he] allowed to reach a determination on the merits * * * [so that he has] had no opportunity in those proceedings to dispute the liability." We disagree. Each of the courts' alternative bases for the denial of petitioner's refund claims was sufficient, by itself, to sustain that result. Where there are multiple bases for the result in a case, they constitute alternative holdings. *See Superior Trading, LLC v. Commissioner*, T.C. Memo. 2012–110, 2012 WL 1319748, at *2 ("These are all alternative holdings, each by itself sufficient to sustain respondent's adjustments."), *aff'd*, 728 F.3d 676 (7th Cir. 2013). Moreover, it is a long-established principle of law that each alternative rationale for the result in a case has precedential value. *See, e.g.*, *Massachusetts v. United States*, 333 U.S. 611, 623 (1948) ("[A]s we were asked to do and rightly could do * * * we decided both issues, and the judgment rested as much upon the one determination as the other. In such a case the adjudication is effective for both."); *Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 340 (1928) ("It does not make a reason given for a conclusion in a case obiter dictum, because it is only one of two reasons for the same conclusion."). Thus, it is clear that, during the refund

litigation in the District Court for the Central District of California and the Court of Appeals for the Ninth Circuit, the offset issue "was raised and considered" and that petitioner "participated meaningfully" in that litigation as required by section 6330(c)(4)(A).

Nor is the application of section 6330(c)(4)(A) as a bar to petitioner's raising the offset issue herein compromised by the fact that that issue was improperly addressed during petitioner's CDP hearing. *See* sec. 301.6330–1(e)(3), Q&A–E11, Proced. & Admin. Regs. ("Any determination * * * made by the Appeals officer with respect to * * * a precluded issue shall not be treated as part of the Notice of Determination * * * and will not be subject to any judicial review * * * it is not reviewable by the Tax Court because the precluded issue is not properly part of the CDP hearing."); *see also Swanson v. Commissioner*, 121 T.C. 111, 118 (2003); *Behling v. Commissioner*, 118 T.C. 572, 579 (2002).

### C. *Conclusion*

Section 6330(c)(2)(B) and (4)(A) alternatively preclude petitioner from raising the offset issue herein.[13]

---

[13] In his opening brief, petitioner seeks credit (offset), not only for the allegedly misapplied payments made to the Commissioner in connection with the New Jersey bankruptcy, but also for some $900,000 "in fees paid to the [California] bankruptcy trustee, the trustee's attorney, the trustee's accountant and the debtor's attorney." Petitioner argues that those expenditures were "needlessly wasted" because proper application of a portion of the New Jersey bankruptcy payments to his account would have eliminated the need for the California bankruptcy proceeding, and the $900,000 "would have been available to pay the tax liabilities" that were satisfied by the June 23, 2000, payment. We agree with respondent that petitioner's failure to make this novel argument during his CDP hearing bars him from making it here. *See* sec. 301.6330–1(f)(2), Q&A–F3, Proced. & Admin. Regs. ("In seeking Tax Court review of a Notice of Determination, the taxpayer can only ask the court to consider an issue * * * that was properly raised in the taxpayer's CDP hearing."); *see also Giamelli v. Commissioner*, 129 T.C. 107, 112–115 (2007).

VI. *The Section 7122(c) Payment Issue*

A. *Analysis*

As noted *supra* note 2, section 7122(c)(1)(A)(i) requires that the submission of any lump-sum OIC "be accompanied by the payment of 20 percent of the amount of such offer." H.R. Conf. Rept. No. 109–455 (2006), 2006 U.S.C.C.A.N. 234, is the report of the committee of conference to accompany H.R. 4297, 109th Cong. (2006), which, when enacted as the Tax Increase Prevention and Reconciliation Act of 2005, Pub. L. No. 109–122, sec. 509(a), 120 Stat. at 362, added the new section 7122(c). The report's explanation of the new provision refers to the 20% payment as a "partial payment" or "down payment" of the taxpayer's liability. H.R. Conf. Rept. No. 109–455, at 234, 2006 U.S.C.C.A.N. at 420–421. Notice 2006–68, sec. 1.02, 2006–2 C.B. 105, states: "The Service will treat the required 20-percent payment as a payment of tax, rather than a refundable deposit under section 7809(b) or Treas. Reg. § 301.7122–1(h)." Moreover, the amended OIC that petitioner submitted to respondent contained the following representation and acknowledgment by petitioner: "I * * * voluntarily submit all tax payments made on this offer, including the mandatory payments of tax required under section 7122(c). These tax payments are not refundable even if I * * * withdraw the offer prior to acceptance or the IRS returns or rejects the offer."

Thus, it is clear that, in the normal circumstances of a taxpayer's submission of an OIC to the IRS, the section 7122(c) payment constitutes a nonrefundable, partial payment of the taxpayer's liability, and petitioner does not argue to the contrary. Petitioner does argue, however, that his amended OIC was neither submitted nor rejected under normal circumstances, and that he is entitled, therefore, to a refund of his section 7122(c) payment.

Petitioner notes that Mr. August assured his counsel that his OIC "would be based on collectibility." He argues that, because his amended OIC was rejected on grounds (e.g., section 7122(a)) other than doubt as to collectibility, Mr. August's assurance to the contrary constituted, under principles of contract law, a "false representation and inducement [that] voids the terms of the offer in compromise and makes

the deposited funds refundable." Respondent argues that we lack jurisdiction to order a refund of the section 7122(c) payment, and that "the proper means of requesting [a] return of the funds is to file * * * [a] claim for refund and, if necessary, a refund suit in federal court." In the alternative, he argues that, because there is no evidence that Mr. August was aware of either the JPC order or the section 7122(a) bar to his acceptance of an OIC when he agreed to make collectibility the sole determining factor in connection with his consideration thereof, he did not "fraudulently misrepresent material facts to petitioner in order to induce him to submit the * * * [section 7122(c)] payment."

We need not address respondent's first alternative ground since we agree with his second; i.e., there is no evidence of false representations or fraudulent inducement. Moreover, petitioner overlooks the fact that among Mr. August's grounds for ultimately rejecting the amended OIC was his finding, based upon Mr. Chun's memorandum, that petitioner had understated the value of his assets and the amount of his anticipated future income, which, in his view, raised "multiple collectibility issues". Also, Mr. August made a finding that petitioner had violated the terms of the OIC by failing to remain in compliance with his tax filing and payment obligations (i.e., he failed to timely file his 2009 return or pay sufficient estimated taxes for 2009 and 2010), a finding that petitioner's counsel admitted to Mr. August was correct.

### B. *Conclusion*

In the light of Mr. August's good-faith processing of the amended OIC, the presence of issues regarding collectibility, and petitioner's noncompliance with his ongoing tax obligations, we find that Appeals did not abuse its discretion in retaining the section 7122(c) payment in conjunction with its rejection of the amended OIC.

### VII. *Conclusion*

We conclude that Mr. August and his Appeals team manager did not abuse Appeals' discretion in rejecting petitioner's OIC and retaining his section 7122(c) payment. Still unresolved, however, is the question of whether it was an

abuse of discretion for Appeals to refuse to withdraw the NFTLs and to sustain the levies.

### A. *The NFTLs*

Pursuant to section 6323(j)(1), the Commissioner is authorized to withdraw an NFTL if (A) the notice is premature or otherwise violates administrative procedures, (B) the taxpayer has entered into an installment payment agreement to satisfy the liability for which the lien was imposed, (C) the withdrawal will facilitate collection of the liability, or (D) the withdrawal would be "in the best interests of the taxpayer * * * and the United States." There is no evidence in the record, nor any claim by petitioner, that any of those conditions has been satisfied. Moreover, Mr. August's "Case Activity Record" states that petitioner's counsel told him he did not care about the liens and that the IRS is entitled to its liens. It was not an abuse of discretion for Appeals to sustain the NFTLs.

### B. *The Levies*

Pursuant to section 6330(c)(3)(C), the determination by the Appeals officer conducting the CDP hearing must "take into consideration * * * whether any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of the person that *any collection action be no more intrusive than necessary*." (Emphasis added.)

While Mr. Chun may have been correct in concluding that the OIC of $1,047,216 was below the realizable collection potential from petitioner and, therefore, insufficient, he suggested, in his January 10, 2011, memorandum to Mr. August, that Mr. August "obtain more updated information"; that Appeals reiterate its "requests for accounting information and accounting statements covering the last five years"; and that "Appeals or the revenue officer obtain the assistance of an IRS engineer to value Isley Brothers LLC." Mr. Chun's suggestions that Mr. August obtain additional information regarding petitioner's assets and future income potential, and his repeated references to potential sources of both that petitioner had failed to include in the financial statements (Forms 433A and B) that he submitted to Mr. August in connection with his OICs, indicate his view (which appears

reasonable) that further negotiations with petitioner might have proven fruitful and that petitioner had (or would have) the financial wherewithal to submit another OIC in a larger amount or, perhaps, enter into an installment agreement with respondent to pay his assessed liabilities over time. Either alternative would have needed the prior approval of DOJ, pursuant to section 7122(a), but, as noted *supra*, either or both petitioner and Appeals could have solicited such prior approval. Also, if petitioner is correct that neither the prosecutor in the criminal case nor petitioner's probation officer actually objected to the acceptance of petitioner's OIC, such approval likely would have been forthcoming.

Moreover, it would appear that petitioner's 2009 and 2010 compliance shortcomings were not intentional and were readily curable. Mr. August's case activity report indicates that the failure to file petitioner's 2009 return was due to a mixup between his advisers as to who had that responsibility, and that the estimated tax payment shortfall was due to the fact that estimated tax payments had been based inadvertently upon petitioner's "touring income" but not his "royalty income".

Under the circumstances, a referral to DOJ being required, we conclude that Appeals acted prematurely in sustaining the levies. Moreover, such an action might very well have been "more intrusive than necessary". Therefore, we will remand the case to Appeals for further consideration and instruct Appeals to reexamine petitioner's financial position, and if, in Appeals' view, it warrants petitioner's submission of another OIC or of an installment agreement (and petition-

er is amenable thereto), to seek approval thereof from DOJ before entering into or processing either. [14]

*An appropriate order will be issued.*

———————

[14] The three-year probationary period appears to have expired at or shortly after the end of 2012. If petitioner has fully complied with its terms, which include the obligation to discharge his liabilities for both the conviction years and the three-year probationary period, or if those liabilities have been discharged by means of a settlement between petitioner and DOJ, there will be nothing more to collect for those years, making the issues of compromise and the continued application of sec. 7122(a) to the conviction years moot. Not having been so notified by the parties, we suspect that that is not the case and that there are still uncollected assessed liabilities. If that is true, DOJ's prior approval of any compromise with respect to the conviction years still will be necessary.